1
2
3
4

UNITED STATES DISTRICT COURT

5

WESTERN DISTRICT OF WASHINGTON

6
7

VINEET PAREKH, Individually and on behalf of himself and all other similarly situated,

Plaintiff,

8

-against-

9
10
11
12
13

AVALARA, INC., SCOTT MCFARLANE, BRUCE CRAWFORD, MARION FOOTE, EDWARD GILHULY, WILLIAM INGRAM, MARCELA MARTIN, TAMI RELLER, BRIAN SHARPLES, RAJEEV SINGH, SRINIVAS TALLAPRAGADA, and KATHY ZWICKERT,

Defendants.

Case No.:  2:22-cv-01580

**SHAREHOLDER CLASS ACTION COMPLAINT**

**VIOLATIONS OF THE SECURITIES EXCHANGE ACT OF 1934**

**DEMAND FOR JURY TRIAL**

14
15
16
17

Plaintiff Vineet Parekh ("Plaintiff"), by his undersigned attorneys, alleges upon personal knowledge with respect to himself, and upon information and belief based on, inter alia, the investigation of counsel as to all other allegations, as follows:

18

**NATURE OF THE ACTION**

19
20
21
22
23
24
25

1.      Plaintiff brings this shareholder class action on behalf of himself and the other former public shareholders of Avalara, Inc. ("Avalara" or the "Company") against Avalara and the former members of Avalara's board of directors (the "Board") for their violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78n(a) and 78t(a) respectively, and SEC Rule 14a-9, 17 C.F.R. § 240.14a-9 ("Rule 14a-9"), in connection with the acquisition of Avalara by Vista Equity Partners Management, LLC ("Vista") for $93.50 per share in cash and $8.4 billion in cash in total.

26
27

2.      On September 12, 2022, to convince Avalara shareholders to vote in favor of the acquisition, Defendants authorized the filing of a materially incomplete and misleading Schedule 14A

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

(the "Proxy") with the Securities and Exchange Commission ("SEC").

3.    Specifically, the Proxy contained the following materially false and/or misleading statements (the "Proxy Misrepresentations"):

      i.    that the unreasonably low May and July 2022 financial projections (the "May Projections" and the "July Projections") set forth in the Proxy and Avalara's October 4, 2022 8-K "w[ere] prepared on a reasonable basis, reflect[ing] the best currently available estimates and judgments, and present[ing], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Avalara" (Proxy p. 63), and were "considered reasonable by Avalara's management as of the date of their preparation" (Proxy p. 64); and

      ii.    the present values per share of Avalara common stock calculated by Avalara's financial advisor using the unreasonably low July Projections under a discounted cash flow analysis and under a selected transaction analysis.

4.    The foregoing statements were false and misleading for reasons fully explained below. In short, despite recognizing the inadequacy of the consideration Avalara's shareholders stood to receive, Defendants misled shareholders into approving the acquisition by (i) creating unreasonably low financial projections to achieve support for the desired fairness opinion; (ii) directing Avalara's financial advisor, Goldman Sachs & Co. LLC ("Goldman Sachs"), to use the July Projections to perform the valuation analyses underlying its fairness opinion; and (iii) using the Proxy Misrepresentations to (a) misrepresent the Board and Management's beliefs regarding the reasonableness of the inappropriately low May and July Projections and (b) mislead shareholders regarding the present value of their shares.

5.    Avalara's shareholder vote regarding the acquisition (the "Shareholder Vote") was held on October 14, 2022 and resulted in the Company's misled shareholders approving the June 21, 2021 merger agreement in reliance on the foregoing misrepresentations.

6.    In total, 33.8% of Avalara's shares voted against approving the deal, abstained from

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  voting, or were not represented at the Shareholder Vote.

2      7.      The acquisition closed on October 19, 2022, causing Avalara's shares to be delisted

3  from the New York Stock Exchange and thereby denying Avalara's public owners the ability to profit

4  from the Company's future growth. Avalara continues to exist as an independent entity under Vista

5  ownership.

6      8.      For the foregoing reasons, and as set forth below, Plaintiff seeks to recover damages

7  from Defendants for violations of Sections 14(a) and 20(a) of the Exchange Act.

8                      **JURISDICTION AND VENUE**

9      9.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act

10 (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) because Plaintiff alleges

11 violations of Sections 14(a) and 20(a) of the Exchange Act.

12     10.      Personal jurisdiction exists over each Defendant. This Court has jurisdiction over

13 Avalara because the Company has its principal executive offices in Seattle, in this District. This Court

14 has jurisdiction over the Individual Defendants because each conducted business in this state by serving

15 as a director of a company headquartered in this District.

16     11.      Additionally, each Individual Defendant committed violations of the Exchange Act

17 within this District, and each has sufficient minimum contacts with this District as to render the exercise

18 of jurisdiction over the Defendants by this Court permissible under traditional notions of fair play and

19 substantial justice.

20     12.      Venue is proper in this District under Section 27 of the Exchange Act and 28 U.S.C. §

21 1391 because Defendants are found in or transact business at their principal executive offices within

22 this District.

23                           **PARTIES**

24     13.      Plaintiff is a resident of California and owned 106 shares of Avalara common stock.

25     14.      Defendant Avalara, Inc. is a Washington corporation with principal executive offices

26 in Seattle. Its common stock trades under the ticker symbol "AVLR".

27     14.      Defendant Scott McFarlane was at all relevant times Avalara's Chairman, Chief

CLASS ACTION COMPLAINT - 3

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    Executive Officer, and founder. He had been steadily liquidating his stake in the Company since at

2    least 2018, typically on a monthly basis, and sold approximately 1.7 million shares in the Company

3    prior to Avalara's acquisition. A significant portion of the share count attributed to him in the Proxy

4    was held in trust for members of his family.

5           15.    Defendant Bruce Crawford was at all relevant times a director of Avalara.

6           16.    Defendant Marion Foote was at all relevant times a director of Avalara. A significant

7    portion of the share count attributed to her in the Proxy was held in trust for members of her family.

8           17.    Defendant Edward Gilhuly was at all relevant times a director of Avalara. He is also

9    the co-founder and partner of Sageview Capital MGP, LLC ("Sageview Capital"), which had invested

10   in Avalara. A significant portion of the share count attributed to Gilhuly in the Proxy was also held in

11   trust for members of his family.

12          18.    Defendant William Ingram was at all relevant times a director of Avalara.

13          19.    Defendant Marcela Martin was at all relevant times a director of Avalara. She also sits

14   on the board of Cvent, a company taken private by Vista in 2016 and relisted on the NASDAQ in 2021

15   that continues to be majority owned and controlled by the firm. Four other directors on the Cvent board

16   are Vista professionals, including the Vista partner responsible for the Avalara deal.

17          20.    Defendant Tami Reller was at all relevant times a director of Avalara.

18          21.    Defendant Brian Sharples was at all relevant times a director of Avalara.

19          22.    Defendant Rajeev Singh was at all relevant times a director of Avalara. He was also on

20   the board of a company, Apptio, that Vista acquired in 2019, and was a board member of the company

21   during Vista's acquisition process. He personally received approximately $10,550,990 from Vista

22   because of that deal through the liquidation of his shares, options, RSUs, and PSUs.

23          23.    Defendant Srinivas Tallapragada was at all relevant times a director of Avalara.

24          24.    Defendant Kathy Zwickert was at all relevant times a director of Avalara.

25          25.    The Individual Defendants referred to in ¶¶14-24 are collectively referred to herein as

26   the "Individual Defendants" and/or the "Board", and together with Avalara, as the "Defendants."

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

## SUBSTANTIVE ALLEGATIONS

2

### A.    Avalara's Business Background and Strong Prospects of Continued Growth Prior to the Announcement of the Acquisition

3

4        26.     Avalara is a software as a service ("SaaS") company that offers a cloud-based

5   transaction tax calculation and compliance system to companies of all sizes worldwide, with a primary

6   target market of small and mid size businesses. The Company was co-founded in 2004 by Defendant

7   Scott McFarlane, and currently has approximately 4,500 employees. Access to Avalara's services is

8   purchased via subscription, allowing the Company to increase its revenues as it expands its subscriber

9   base.

10       27.     The Company currently has approximately 30,000+ customers across 95 countries,

11  spanning sectors like consumer retail, logistics, communications, fuel and energy, manufacturing, and

12  direct-to-consumer alcohol distribution. In 2021, Avalara filed 4.1 million tax returns on behalf of its

13  customers, saving its clients extraordinary amounts of time and money.

14       28.     At a high level, Avalara automates the routine transaction tax work traditionally

15  performed by a company's tax or legal department. Instead of independently researching tax rules,

16  manually computing transaction taxes, creating DIY tax calculation systems, and submitting individual

17  checks to numerous jurisdictions, Avalara's customers make a single ACH payment to a single

18  account, with Avalara's system then taking care of the returns and remittances.

19       29.     The Company handles these calculation and remittance functions across 13,000+ U.S.

20  and international tax jurisdictions, thousands of product types, and multiple important tax types

21  commonly incurred during business transactions, all using a vast array of tax rules maintained on the

22  backend by Avalara's tax analysts and programmers, allowing businesses to save costs that would

23  otherwise be spent on internal and external tax and accounting staff. Users can also easily create tax

24  reports, access their business's historical tax filings, and maintain other tax-related documentation,

25  including business licenses and exemption certificates.

26       30.     Companies using the platform match their products, services, and fees to an Avalara

27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

tax code (there are thousands)[1] and manually or automatically input certain other important information used to identify the taxes and tax jurisdictions applicable to a transaction, like the physical location of a business. Most inputs though, like occurrences of specific sales, are fed to Avalara's system through software linkages called "integrations" that allow Avalara's system to transfer and receive data from other programs. Avalara presently offers 1,200+ of these integrations, including with numerous ERP[2] and other business programs (including ones developed by Oracle, SAP, Microsoft, and Intuit), online retail platforms (including Amazon, eBay, Etsy, and Shopify), and numerous shopping cart, sales, and payment processing programs. The system is highly integratable by design.

31.     Avalara generates revenue from these operations by charging subscription fees and billing for professional services[3] in connection with its platform, with subscription income currently representing approximately 90% of the Company's revenue.

32.     The Company's revenue growth has been extremely strong, with total annual revenues growing at a compound annual growth rate ("CAGR") of *33.6%* from 2015 to 2021 and by 567% overall during that period, the earliest and latest years with available figures for total revenue.[4]

33.     Moreover, the Company's actual year-over-year growth rate has tended to *increase*, most recently to an annual revenue growth rate of *39.6%* from 2020-2021.

---

[1] E.g., PA2010100: Spirits sold "by the drink" for immediate consumption; PM039396: Periodical/magazine subscriptions with a weekly publication; SW040700: Watercraft repair services; ST157138: Title search services related to real estate; OF04005: Late payments or penalty charge associated with recurring debts or extension of credit.
[2] An enterprise resource planning ("ERP") system is a software program that companies use to manage business functions.
[3] Examples of professional services provided by the Company include handling business license and tax registrations, tax refund and recovery assistance, tax nexus studies, and back filing services.
[4] A compound annual growth rate represents the annualized rate of change for a figure over time, here Avalara's annual revenue from 2015 to 2021.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1
2
3
4
5
6
7
8
9



10    34.    For financial reporting purposes, the Company also tracks its number of "core
11 customers", which Avalara defines as unique account identifiers in its U.S. billing system that are
12 active and have generated more than $3,000 in total revenue during the preceding 12 months. As with
13 revenue, Avalara's core customer count has been growing strongly since its IPO in 2018:

14
15



16
17
18
19
20
21
22
23
24
25
26
27

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

35.     On average, the Company has gained 750 customers per quarter since 2018, and that figure has continued to trend upwards (red line represents linear trend line):



36.     Notably too, Avalara has been able to sustain a stable *and* high margin level while *also* (as shown above) increasing its revenue growth rate and customer base, an impressive feat in the tech and SaaS sectors. Gross profit margins (percentage of total revenue remaining after deducting cost of revenue) were 71% in 2018, 70% in 2019, 71% in 2020, and 71% in 2021, a remarkably stable 1% spread since the Company's IPO. Over that same 2018-2021 period, Avalara completed 12 strategic acquisitions, extensively expanded the tax compliance capabilities of its service, doubled its number of core customers, and increased its revenues by 260%, from $272 million to $698 million. Organic revenue growth (revenue growth not attributable to recent acquisitions) has been similarly strong, increasing approximately by 29%+ per year, in excess of guidance provided by the Company.

37.     Importantly, Avalara consistently achieved its growth through *both* organic growth *and* acquisitions of smaller companies offering niche products and services, with *both* organic growth and opportunistic M&A deals serving as complimentary parts of the Company's *standalone* strategy, and Avalara had no intent of changing plans. *See*, Q1 2021 earnings call comments by Defendant McFarlane (May 5, 2022) ("Going forward, we will continue to aggressively pursue and grow our core business in indirect tax, through organic investments and M&A. We expect M&A will be an important contributor to our international growth plans."); Avalara acquisition press release (Aug. 8, 2022) ("In

partnering with Vista, Avalara will look to build on its successful platform by refining its go-to-market strategy, expanding its international workforce, streamlining its systems architecture, *and continuing to pursue value-accretive M&A opportunities*.).

38.    From 2007 to 2021, Avalara acquired 28 companies in total, typically 1-3 per year (1-3 acquisitions in 11 out of 15 years). Moreover, the Company's acquisition rate has increased overall, with 12 of these transactions occurring since 2018, the year the Company held its IPO.

39.    Thus, Avalara's acquisition practices corroborate McFarlane's above statement and the statement in Avalara's official press release for the Vista deal: opportunistic acquisitions of smaller companies have been and continue to be an integral part of the Company's growth strategy:



40.    Avalara's performance and prospects positioned the Company to deliver long-term shareholder growth, which was reflected in Defendant McFarlane's statements at quarterly earnings calls right up to the announcement of the acquisition.

41.    At Avalara's earnings call on November 4, 2021 for Q3 2021, McFarlane described his vision for the Company and its prospects as follows:

> **Scott McFarlane:** As I've said before, it's a long-term journey and we have a bold vision to be part of every transaction in the world. Our leadership recognition validates what we've been saying over the past few years and we fully expect that our position in these industry analyst reports will continue to grow as we execute our vision.

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

As I've mentioned before, Avalara is in a unique position to benefit from four major trends we are seeing impacting businesses of all sizes, including, the fundamental shifts in the fabric of commerce and regulatory obligations, along with rising adoption of cloud-based infrastructure and ROI expectations in the market. The growth of omnichannel commerce is a generational opportunity for Avalara.

Business is adopting or expanding e-commerce and marketplaces selling our excellent prospects for us as their omnichannel complexity and compliance exposure grows. As more businesses of all sizes continue to replace on-premise applications with cloud services, the concept of cloud compliance has shifted from a novel approach to an expectation in the market. […]

We know how this story ends. Compliance will be automated. Our goal and our obligation as a leader, is to accelerate the process of helping companies around the world understand their exposure and how they can address it with the leading cloud compliance solution. Status quo has always been our most powerful competitor, and we intend to harness these catalytic trends and capture the future.

42.    Ross Tennenbaum, Avalara's CFO and a key decisionmaker at the Company, elaborated on Avalara's strategic vision in further remarks:

**Ross Tennenbaum:** We are currently at the center of four powerful forces driving our long-term opportunity and continue to believe the solutions we provide are in the early innings of market penetration. Beyond opportunities to expand our core business, we see new growth drivers from our partner ecosystem, international and our expanded platform story. The acceleration of e-commerce coupled with favorable regulatory changes has increased awareness of the importance and complexity of tax compliance for businesses, marketplaces and e-commerce platform providers.

For us this is fueling an exciting wave of significant expansion opportunities with a number of industry leading partners and is gaining the attention of businesses grappling with the complexities of both national and global e-commerce compliance requirements.

The international landscape is also changing fast. We believe new regulations aim to make calculating a reporting transactional taxes more real time, which will require software automation solutions. We also believe e-commerce is increasingly enabling even small businesses to be global merchants and thereby having to face a wide range of tax compliance complexities that also require our software solutions.

And finally, our recent organic and inorganic product additions [(an organic product addition is a product developed internally by Avalara; an inorganic product addition is a product acquired by purchasing a separate company)] will help us transition to a platform company where we can offer a broader range of compliance solutions, thereby, expanding the value we can provide our customers. […]

In closing, we have an exciting opportunity to continue building a durable growth compounding company. We believe we are a leader in a large market that's still early to adopt tax compliance automation technology. We are seeing a demand transformation as businesses become omni-channel, operate in many jurisdictions and

CLASS ACTION COMPLAINT - 10

1    shift their business to e-commerce in the cloud. These changes coupled with an ever-
2    shifting regulatory environment make it even more difficult to maintain tax compliance
     without automation. […]

3    43.    And as McFarlane established in further comments, Avalara was living up to its bold

4    strategic vision. Q3 was "another great quarter for Avalara…representing an increase of 42% year-

5    over-year, one of our strongest quarters in history [and Avalara's] best fiscal year-to-date performance

6    in terms of revenue growth rate since going public." This "strong growth was driven by solid

7    performance across the business and the addition of strategic acquisitions that we closed since Q4

8    2020." Avalara's "core customer count increased by 830 from the previous quarter to approximately

9    17,400 at the end of Q3 2021, a year-over-year increase of 22%."

10   44.    On November 5, 2021, the day following the presentation, the investment bank Mizuho

11   released a price target for Avalara of $219.

12   45.    At Avalara's earnings call on February 10, 2022 for Q4 2021, McFarlane described

13   2021 as "another terrific year for the Company". Avalara had "accelerated [its] top-line growth", the

14   Company continued to be a "[leader in a] large, low-penetrated market …with competitive moats and

15   a differentiated business strategy", and the Company's "thesis and vision" for itself had not changed.

16   McFarlane made clear that he expected to "continue building a durable growth compounding

17   company":

18       **Scott McFarlane:** We have an exciting opportunity to continue building a durable growth
19       compounding company. We believe we are a leader in a large market that is still early to adopt
         tax compliance automation technology. We are seeing a demand transformation as businesses
20       become omnichannel, operate in many jurisdictions and shift their business to e-commerce and
         the cloud. These changes, coupled with an ever shifting regulatory environment, make it even
21       more difficult to maintain tax compliance without automation.

22       At the same time, we are continuing to evolve to a platform company, driving an increased
         supply of products and capabilities, which will deliver even more value to our customers. We
23       also continue to invest to win additional segments and geographies so that we can continue to
         compound growth for the long term.

24   46.    Avalara also reported a "40% total year-over-year [revenue] growth", and a "29% year-

25   over-year" increase in organic revenue, with the Company's core customer count increasing by 870.

26   47.    On February 11, 2022, in response to these and other statements, Raymond James

27   issued a price target for Avalara of $155, and BMO Capital Markets issued a price target of $138. The

CLASS ACTION COMPLAINT - 11

following month, Stifel Nicolaus targeted $115 and Morgan Stanley targeted $130.

48.     At Avalara's next and final earnings call on May 5, 2022 for Q1 2022, McFarlane restated his thesis that Avalara was a "long and strong growth compounder" and further identified several broad, continuing advantages that he believed supported Avalara's long term growth. The Company sells to a "massive global market driven by ["ever-increasing"] statutory requirements", is a "leader and category definer" within that market, enjoys tailwinds resulting from the increasing adoption of cloud-based applications and online retail platforms, has a "strong and sticky customer base", and offers a cost-saving service that helps the Company's customers become more efficient.[5] Looking ahead, McFarlane also saw "significant opportunities" for the Company as it used its "growing scale, competitive moats [e.g., barriers to entry due to product complexity], and ubiquity in the market" to become *the* standard solution for cloud-based tax compliance services:

> **Scott McFarlane:** I want to reiterate what I'd said before. Not all SaaS businesses enjoy the structural advantages we have. We help businesses become more efficient. We have a strong and sticky customer base that needs additional compliance. We believe we are a long and strong growth compounder and well positioned to grow in good and in challenging times.
>
> Our thesis and vision have not changed. We remain a leader and category definer in a massive global market, driven by statutory requirements, and we enjoy enviable tailwinds tied to the increasing adoption of cloud-based business applications and omnichannel selling platforms, ongoing ROI focus and purchasing decisions and ever-increasing regulatory burdens. We believe that over the long-term, every business will adopt tax automation. We are still early in this journey and we believe we are best positioned to capture the leading share in this expanding market.
> We see significant opportunities in front of us and I'm excited about leveraging our growing scale, competitive moats, ubiquity in the market to establish Avalara as the standard cloud compliance platform.

49.     McFarlane further announced several new large customers, including an online travel agency and companies involved in mobile phone services, battery distribution, printer and copier supply, cookware sales, pet retail, and construction. A key factor in these wins, according to McFarlane, was Avalara's emphasis on partnering with a large and growing number of business application companies to develop software integrations for Avalara's products, allowing the

---

[5] As noted in one non-public analysis of Avalara on May 5, 2022, "[i]n this environment, offering cost savings is a more resilient software business model than offering revenue generation."

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Company's customers to easily link Avalara's system into their existing retail systems and business software products.

> **Scott McFarlane**: As demonstrated to our customer wins, Avalara's partner moat continues to be a key differentiator, especially as businesses shift to omnichannel and seek a single tax compliance platform that can integrate into multiple disparate systems. In fact, our…partnerships are becoming even more formidable with an increase in multi-connector deals supporting the vast array of our smaller niche partners. That's why we continue to enhance our partner moat by actively forging new relationships that enable us to offer integration with more business applications and exposure to more potential customers. We offer far more prebuilt integrations with these applications than any other tax software providers and we plan to continue adding more.

50.     In additional important comments, Avalara's CFO, Ross Tennenbaum, detailed why Avalara would perform well even if economic conditions tightened and cautioned analysts valuing the Company to avoid "over index[ing]" their expectations for the Company on a slowdown in e-commerce growth. The Company's tax calculation business operates on a subscription model based on transaction volume, not the "GMV" (gross merchandise value) of a customer's total sales. Subscriptions also use wide pricing bands, tempering any revenue volatility that Avalara might experience as a result of customers moving to lower subscription price tiers due to slowing sales. Moreover, the Company's customers are highly diversified by business sector, with less than 20% of Q1 2022 revenue coming from retail customers. Significantly too, required tax returns have to be filed regardless of other economic circumstances.

> **Ross Tennenbaum**: I'd say don't over index on the e-commerce growth slowdown and draw conclusions about Avalara. It would be a mistake for investors to assume that we have this outsized exposure because that's simply not the case.
> Our customer base is very diverse, including customers of every size from nearly every industry and many geographies. And as a matter of fact, our customer base is more weighted to B2B than B2C. We are also a subscription model business and not tied to GMV. Even our calculation business, which is tied to transaction volumes is now less than 50% of revenue and has shown its resiliency throughout the pandemic due to our wide pricing bands, designed to reduce volatility of customers having to move up and down tiers.
>
> And in our compliance business, our customers must file compliance documents where required regardless of how well or poor their businesses performing. The last two years, acceleration of e-commerce indeed benefited us, but it didn't have anywhere near the financial benefit on our business that it had on e-commerce and GMV related businesses. For example, we grew organic revenue by 29% in each

of the last two years, a great result, but hardly an accelerated pull forward in demand.

In addition, we believe our broad customer diversity helps insulate us from shocks to e-commerce in the broader economy. As evidence of this diversity, when we map our customer database to third-party data, we find that less than 20% of our Q1 2022 revenue comes from retail customers.

In addition, only around 10% of Q1 2022 revenue came from marketplaces and our Avalara included relationships, including Shopify, BigCommerce and Wix among others. When we added in our direct e-commerce partners including partners such as Salesforce and Adobe, the total comes to approximately one-third of Q1 2022 revenue though, we see many larger customers and a higher mix of B2B customers with these direct e-commerce partners.

51.     The Company also "reported total revenue of $204.5 million, an increase of 33% year-over-year", and an increase of 29% year-over-year in organic revenue growth.

52.     On May 6, 2022, the day following the call, Mizuho released a price target for Avalara of $110. Canaccord Genuity released a price target of $100.

53.     Avalara held its analyst day on July 28, 2022. In a presentation Avalara released for the day, the Company reiterated the positive statements McFarlane had expressed on the Company's earnings calls and highlighted some of the significant tailwinds supporting the Company's high growth rate. As it stated, more businesses are adopting powerful "real-time, transaction-level[,] cloud[-based]" tax compliance services; the complexity of next-gen payment automation technology (like e-invoicing services) promises to deepen Avalara's competitive advantages; as Avalara's range of services expanded, so did its opportunities for cross-selling; and the Company was "[w]inning" what it termed the second wave of partnerships" with marketplaces, e-commerce platforms, and point of sale system companies.

54.     In summary, after strong, consistent growth and record revenue production every quarter since the Company's IPO, optimistic statements by McFarlane, senior management, and official company presentations, and high analyst expectations, shareholders had strong cause for confidence regarding the Company's ability to deliver a share price reflective of its expanding business, sector-leading tax compliance technology, and strategy of engaging in opportunistic M&A transactions to further accelerate its growth.

**B.      Deal Announcement and Negative Reactions to the Acquisition**

55.      Despite the Company's strong prospects, Avalara's Board commenced a sale process for the Company in April 2022. The sale process developed in response to incoming interest received that month by Avalara's senior management (almost certainly including McFarlane) from four private equity firms identified in the Proxy as parties A, B, C, and D. That incoming interest, in turn, resulted from a drop in the market price of Avalara stock primarily driven by macroeconomic trends like increases in borrowing costs and investor aversion to tech and "growth" stocks, not the Company's financial or business performance.

56.      From December 31, 2020 to June 30, 2022, Avalara's market capitalization[6] dropped from $13.6 billion to $6.2 billion (a 54.5% drop) and its stock price dropped from $165 to $71 (approximately 57%). In contrast, Avalara had total revenues of $380 million for the year ended December 31, 2020 and total revenues of *$790* million in the yearlong period ended June 30, 2022 (the most recent yearlong period with available data). I.e., Avalara's stock price dropped by 57% even though revenues increased by 108%, and share dilution played no significant role in the drop. The Company also maintained its margins and experienced strong business gains over this time, as discussed above. For private equity firms with available cash in 2022 (in industry parlance, "dry powder"), Avalara's drop in market price presented a compelling buying opportunity. Fundamentally however, Avalara had no *need* to sell. The company had no liquidity problems and was continuing to reap the rewards of its strong standalone organic and inorganic growth.

57.      Nevertheless, in response to incoming private equity interest from the above four private equity firms, McFarlane and the Board launched a sales process for the Company during a time of significant market volatility and depressed financing conditions, making it difficult for the Company to achieve a price reflective of its intrinsic value. Notably too, Avalara only negotiated with private equity firms during the process (eight firms in total), ensuring that Avalara management would keep their jobs in a transaction, and only one party (the winner, Vista) submitted a final bid. There was no

---

[6] A company's market capitalization is the market price of its shares multiplied by its total share count.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

outreach to potential strategic acquirors.

58.     Ultimately, Avalara executed the Merger Agreement with Vista on August 8, 2022 and announced the transaction the next day:

**Avalara to be Acquired by Vista Equity Partners for $8.4 Billion**
SEATTLE, WA — August 8, 2022 — Avalara, Inc. (NYSE: AVLR), a leading provider of tax compliance automation for businesses of all sizes, today announced it has entered into a definitive agreement to be acquired by Vista Equity Partners ("Vista"), a leading global investment firm focused exclusively on enterprise software, data, and technology-enabled businesses, in partnership with institutional co-investors.

Under the terms of the agreement, Vista will acquire all outstanding shares of Avalara common stock for $93.50 per share in an all-cash transaction valued at $8.4 billion, inclusive of Avalara's net debt. The per share purchase price represents a premium of 27 percent over the Company's closing share price as of July 6, 2022, the last trading day prior to media reports regarding a potential transaction.

Founded in 2004, Avalara's success is built up on an extensive partner network; large tax content data and repository to help customers stay up to date on dynamic tax rules and regulations; and its cloud-native, end-to-end multi-product tax compliance portfolio. In partnering with Vista, Avalara will look to build on its successful platform by refining its go-to-market strategy, expanding its international workforce, streamlining its systems architecture, *and continuing to pursue value-accretive M&A opportunities.*

"For nearly two decades, Avalara has ambitiously pursued its vision to automate global compliance, making tax less taxing for businesses and governments around the world. As a leader in this category, we believe our continued investment in innovation and experience is exciting for our customers, partners, and employees. We are pleased to partner with Vista and will benefit from their expertise in enterprise software as we build and improve upon our cloud compliance platform," said Scott McFarlane, co-founder and CEO of Avalara.

"Vista has built a reputation as a preferred partner for founder-led, next-generation software companies," said Monti Saroya, Co-Head of Vista's Flagship Fund and Senior Managing Director. "We look forward to working with Scott and the entire Avalara team to advance their vision and continue delivering innovative solutions to customers."

"Avalara is a mission-critical platform serving customers in a variety of end-markets, including retail, manufacturing, hospitality, and software," said Adrian Alonso, Managing Director at Vista. "Avalara's solutions, its commitment to product innovation, and its network of extensive partner integrations, resellers, and accountants make it a true leader in the space."

59.     After announcement, Goldman Sachs "received inquiries of varying degrees of seriousness from a variety of parties", strong evidence that Avalara had failed to adequately explore the true pool of potential bidders during the process. Avalara was unable to adequately explore this incoming interest, however, because it had agreed to a no shop provision in the merger agreement.

60.     In addition, *all* analyst price targets for Avalara published in 2022 prior to

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

announcement significantly exceeded the deal price of $93.50 per share. Nine price targets were published in total, with a mean price target of $121 overall and approximately $105 in Q2 onwards. No price target was below $100.

| Analyst | Price Target | Publication Date |
|---------|--------------|------------------|
| Goldman Sachs | $109 | 7/14/22 |
| Canaccord | $100 | 5/6/22 |
| Mizuho | $110 | 5/6/22 |
| Bank of America | $100 | 4/25/22 |
| Morgan Stanley | $130 | 3/24/22 |
| Stifel Nicolaus | $115 | 3/21/22 |
| BMO Capital | $138 | 2/11/22 |
| Raymond James | $155 | 2/11/22 |
| Citigroup | $130 | 2/1/22 |

61.    Notably, the month prior to announcement, Goldman Sachs (Avaara's financial advisor in the deal) published a price target of $109 per share, a 17% premium to the obtained price.

62.    Contrary to typical practice in proxy statements concerning M&A transactions, the Proxy made no mention of the foregoing price targets, avoiding alerting shareholders that the acquisition consideration was below all analyst price targets for Avalara.

63.    After announcement, analysts covering the deal reacted critically:

- "Given Avalara's leading position in the large and underpenetrated market for tax compliance automation software, our initial view is that the proposed transaction price is somewhat underwhelming." (William Blair)

- We do wonder if they could do better than the current implied valuation… [We] wouldn't be surprised [if] a modestly higher price is ultimately achieved for shareholders." (Needham)

- "There has been a lack of enthusiasm from our investor conversations this morning…. We believe the [near-term] outlook likely pushed the needle towards taking a deal at a multiple that could prove conservative over the [long-term] and may have been a bit lower than what some investors were hoping for." (Evercore)

- "[W]e are a little surprised at AVLR's willingness to sell at $93.50 given its recently

laid out medium-term targets ($250 million of FCF by CY 25) and an aspirational goal of reaching $3 billion in revenue." (Raymond James)

64.     Likewise, sophisticated stakeholders announced their opposition to the transaction, including Altair US, LLC ("Altair") an early investor in Avalara that owned 1% of the Company at announcement.

65.     As Altair explained in an open shareholder letter published September 8, 2022, Avalara had decided to sell during a period of severe market turbulence, preventing the Company from achieving a price reflective of its intrinsic value as a fundamentally sound business experiencing strong sustainable growth:

> "[V]olatile capital markets have lowered equity valuations and made financing of large buyout transactions difficult. The Russell 3000 was down 20% during the first half of 2022, its worst start to the year ever. For technology companies, these issues have been compounded by the normalization of growth and post-pandemic demand, rattling investor confidence in the sector. Not surprisingly, Avalara's stock price was down approximately 23% during the first quarter of 2022 given these economic uncertainties and the "risk off" capital markets environment.

> While Avalara's share price declined as investors pulled back from higher-risk assets, there were no signs that the Company's long-term prospects were fundamentally impaired. As noted above, in May and June, the Company's executive officers continued to express great confidence in the Company's prospects and batted away concerns that the economic slowdown would have much impact on the Company in the mid- to longer-term. Notably, on the May earnings call, for example, Mr. Tennenbaum said that Avalara's broad customer diversity helps "insulate the [Company] from shock to e-commerce and the broader economy" and that its international business remains "a huge opportunity and green space" going forward. […]

> Faced with uncertain economic times—but ones the executive team was confident the Company would weather successfully—a depressed stock market and a volatile financing market, it is incomprehensible that the Board would have thought the timing was optimal to maximize the value of the Company in a sale. […]

> By July, as proposals for Avalara were due under the Board's process, high-yield corporate bond spreads to treasury yields had widened more than 200 basis points from January, significantly affecting the availability of financing and the cost of debt for any buyout. Notably, the number of announced private equity buyouts in the $5 billion to $10 billion range in Q2 was down more than 40% from a year earlier because of the turmoil in the economy and financing markets.

> There is no doubt that the Board's timing for conducting the once-and-only sale of Avalara impacted the number of proposals and the competitive nature of the "auction." Several potentially interested parties withdrew from the process, specifically citing unfavorable market conditions and an uncertain macroeconomic environment. Even Vista itself did not initially submit a proposal due in part to difficulty securing financing because of the "deterioration in the financial markets" and then came back with a lower indication of interest than what it had originally proposed[.]

CLASS ACTION COMPLAINT - 18

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

Most companies interested in examining a sale determined that Q2 was not the time to be negotiating a deal. Indeed, that sophisticated private equity firms with strong track records in the sector did not have the conviction to make a proposal (or could not obtain enough or inexpensive enough financing to make a proposal) for Avalara should not have been a surprise to the Board, given the general market conditions and widely acknowledged dislocation in the buyout market.

The surprise, instead, is that the Board ignored these glaring signs of bad timing and proceeded to sell the Company anyway. […]

The Board, in the face of this macroeconomic adversity unrelated to the market for tax compliance software, should have insisted that the Company execute through the economic trough, with a plan to emerge stronger and create value in the future. If the Company is to be sold, it should be sold from a position of strength, in a robust financing market and only after a well-run, competitive process. This is not that time.

66.     Another large investor, Merrion Investment Management, announced its opposition to the transaction on September 15, 2022.

67.     Significantly too, the institutional advisor Glass Lewis recommended against the acquisition, stating as follows:

[T]he purchase price and implied valuation metrics of the transaction are uncompelling and, ultimately, inadequate when compared to the Company's historical valuation and the prices paid for other software companies in precedent transactions, including those selected by Goldman Sachs for its fairness opinion. We also take a dim view of the timing and other aspects of the process resulting in the transaction, including apparent conflicts of interest stemming from Goldman Sachs' longstanding relationship with Vista and certain Avalara directors' ties to Vista, for which the Avalara board took no action to attempt to mitigate. These concerns raise doubt, in our view, as to whether the transaction is the result of a truly robust and independent process and whether the interests of Avalara's shareholders and the primary objective of maximizing long-term shareholder value were the drivers of the process. All factors considered, we believe these concerns justify voting against the proposed transaction.

Upon review of the rationale, process and terms of the proposed transaction, we have concerns about the questionable deal timing, the sometimes inexplicable course of the deal discussions and negotiations, the board's pessimistic reasoning for adopting the merger agreement, apparent conflicts of interest in the decision-making process, and the uncompelling and inadequate valuation of Avalara in the transaction.

[T]he limited number of potential bidders involved in the process, the fact that only one other party submitted even a preliminary indication of interest, the deterioration in the financial markets, and the disappearance of cheap and available financing for private equity firms all contributed to the sale process going more Vista's way than the way of Avalara shareholders.

[W]e find more persuasive evidence to suggest that, near-term challenges and uncertainty notwithstanding, under the oversight of a capable board and

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

management team, the Company could reasonably deliver greater value for shareholders in the medium-to-long term than that offered in the transaction.

Due to a variety of factors, not the least of them being the current unfavorable market conditions for a large transaction involving a high-growth software company, we believe the proposed price meaningfully undervalues the ongoing intrinsic value of the Company's business[.]

We observe that, between late January and July 2022, the Company's strategic review process quickly shifted from Avalara pursuing acquisition targets in order to expand its international operations, to Avalara fielding unsolicited interest from private equity firms, to Avalara actively soliciting acquisition interest from a limited set of potential buyers with little success, to the board terminating the sale process, and finally, somewhat inexplicably, to the board accepting the lone bidder's downward revised offer amid strained financing conditions and a volatile, deteriorating market environment. At the risk of stating the obvious, this is generally not how a strategic review or sale process is supposed to go.

While the Company claims the proposed price is attractive and compelling for investors, we see scant, if any, evidence to suggest that is the case. The board points to a market premium relative to a trading price for the Company that was close to a two-year low in an unfavorable market environment, and a revenue multiple that appears acceptable only when juxtaposed to a broad set of historical transactions going back 10 years involving companies which, for the most part, are not comparable to Avalara or the proposed transaction, in our view. … [T]he proposed purchase price is reflective of macro uncertainty, unfavorable market conditions and a questionable sale process, not Avalara's business fundamentals, growth trajectory and intrinsic value.

[W]e believe various paths continue to exist for Avalara as a standalone company that could potentially deliver significant value creation for shareholders over the medium-to-long term. In our view, such value, even on a time- and risk-adjusted basis, appears to be greater than Vista's all-cash offer.

[G]iven that Avalara's business fundamentals remain strong, despite certain challenges and headwinds, we see little reason for investors with a long-term horizon and moderate risk tolerance to crystallize the value of their investments in Avalara at such an inopportune time and unattractive price.

68.     Institutional Shareholder Services, a further key institutional advisor, provided cautionary support for the transaction but reiterated many of the problems identified above. ISS also noted the shift in the Company's messaging following the Proxy, remarking that "[t]he shift in narrative from [Avalara's] management is concerning, with a whiplash turn from positive comments regarding the business' prospects at the June investor day to current worries about employee attrition, European growth, product development, and squandered opportunities."

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

C.      **The False and Misleading Statements in the Proxy (the "Proxy Misrepresentations")**

69.     Defendants solicited shareholder approval for the Merger by filing a false and misleading Proxy with the SEC. This Proxy misled shareholders about Avalara's value by making false and misleading statements concerning the projections, the projections themselves, and the value of Avalara shares. Specifically, Plaintiff challenges the following statements from the Proxy as false and/or misleading:

i.      that the intentionally low May and July Projections "w[ere] prepared on a reasonable basis, reflect[ing] the best currently available estimates and judgments, and present[ing], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Avalara" (Proxy p. 63), and were "considered reasonable by Avalara's management as of the date of their preparation" (Proxy p. 64); and

ii.     the present values per share of Avalara common stock calculated by Avalara's financial advisor using the unreasonably low July Projections under a discounted cash flow analysis and under a selected transaction analysis.

70.     First, the Proxy falsely stated that the Board believed that the projections were prepared on a reasonable basis, reflected the best currently estimates and judgments, and presented, to the best of management's knowledge and belief, Avalara's expected future performance.

71.     As set forth above and explained further below, this statement was false. Defendant McFarlane and Company management created the May and July Projections using assumptions that were inconsistent with their own publicly-expressed optimism regarding Avalara's future and statements about Avalara's intent to continue pursuing opportunistic M&A transactions. Moreover, the Board—which McFarlane chaired—was (i) aware that Avalara management had made strongly optimistic public statements about the Company's prospects and ongoing performance; (ii) aware that Avalara management intended to continue opportunistic M&A transactions as part of Avalara's standalone plan; and (iii) aware that the July Projections used a growth rate that was inconsistent with (a) Avalara's

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

ongoing performance, (b) management's stated beliefs regarding that ongoing performance and the Company's prospects, and (c) Avalara management's history and continued plans of using opportunistic M&A transactions to increase Avalara's growth rate. In short, the Board did not hold the belief that the May and July Projections were reasonably prepared estimates of Avalara's expected future financial performance.

72.     As explained, both the May and July Projections Avalara prepared for the merger were dramatically low relative to the Company's historical growth rate, recent growth rate, and strategy of using opportunistic M&A transactions as part of its standalone strategy. In particular, the projections represented a *significantly lower rate of increase* than the Company's most recent demonstrated revenue growth rate of *39.65%* (for 2020-2021) and longer-term demonstrated revenue growth rate of *33.6%* (for 2015-2021), and were also inconsistent with the Company's continuing practice of using opportunistic M&A transactions as part of its *standalone* strategy, which has kept the Company's growth rate several percentage points higher than its organic growth rate in recent years.

73.     Although the Company's organic growth rate has hovered at 29%, total revenue growth rates after including the effects of opportunistic M&A deals range from 33.6% historically to 39.65% more recently. And crucially, Avalara had—and continues to have—no intent of stopping its strategy of using opportunistic acquisitions to build out its system's capabilities. McFarlane stated as much in the final earnings call before announcement, and even Avalara's press release for the merger stated that the Company would continue pursuing strategic acquisitions under Vista. The Board was aware or should have been aware of these statements and knew or should have known that the revenue impact of Avalara's acquisitions had to be reflected in the Company's standalone projections.

74.     Ultimately, the inappropriately low July Projections cut hundreds of millions of dollars from Avalara's revenue relative to the Company's likely prospects, as indicated by an alternative revenue projections model based on the Company's 33.6% CAGR for total revenue from 2015-2021.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660



**Projected Revenue – Table of figures (*in thousands*)**

|  | **2022E** | **2023E** | **2024E** | **2025E** |
|---|---|---|---|---|
| May Projections (27.64% Rev. CAGR) | $904,000 | $1,160,000 | $1,475,000 | $1,855,000 |
| July Projections (26.56% Rev. CAGR) | $869,000 | $1,106,000 | $1,405,000 | $1,793,000 |
| Alternative Projections 1 (33.6% Rev. CAGR) | $933,833 | $1,247,601 | $1,666,795 | $2,226,838 |
| Alternative Projections 2 (39.6% Rev. CAGR) | $975,772 | $1,362,178 | $1,901,600 | $2,654,633 |

75.    Second, the present values per share of Avalara common stock resulting from Goldman Sachs' analyses were false and misleading because the valuations resulted from artificial inputs intended to bring down the Company's appraised worth.

76.    These depressed projections, and in particular the depressed July projections, had a substantial negative impact on the Company's projected free cash flow, which in turn directly reduced the Company's implied equity value under Goldman Sachs' discounted cash flow analysis of Avalara's

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

value—the most important valuation method Goldman Sachs used to appraise the Company.[7][8] As the technique's name suggests, a discounted cash flow analysis calculates the value of a business based on the present value of the business's projected future bottom line cash flows.

77.     Due to the method's operation, a discounted cash flow analysis is acutely sensitive to small differences in the underlying financial inputs affecting a Company's projected future cash flows, particularly to the extent these inputs alter the growth rate of projected cash flows. As explained by a highly respected professor with expertise in the study of M&A transactions:

> [A] discounted cash flow analysis is conducted by discounting back at a chosen discount rate the projected future free cash flows and terminal value of an asset. In performing this analysis there are three central choices, which must be made, each of which can significantly affect the final valuation. These are the correct forecasted free cash flows to utilize, the appropriate discount rate, and the terminal value of the asset. There is substantial leeway to determine each of these, and any change can markedly affect the discounted cash flow value. […]
>
> This dazzling variability makes it difficult to rely, compare, or analyze the valuations underlying a fairness opinion unless full disclosure is made of the various inputs in the valuation process, the weight assigned for each, and the rationale underlying these choices. The substantial discretion and lack of guidelines and standards also makes the process vulnerable to manipulation to arrive at the "right" answer for fairness. This raises a further dilemma in light of the conflicted nature of the investment banks who often provide these opinions.[9]

78.     Here, holding down Avalara's revenue projections would have depressed the Company's bottom line cash flow, resulting in a lower implied valuation for the Company and thereby enabling Defendants to mislead shareholders into accepting an inadequate price for their shares.

79.     This analysis asserted that Avalara stock was worth "$54.74 to $112.95" per share. However, this statement was a false and misleading description of Avalara's present value because the

---

[7]     "Discounted cash flow (DCF) forms the core of finance…. Though professionals may employ other methods of valuation, such as relative valuation and the contingent claims approach, DCF forms the basis for all other valuations. Underscoring the importance of DCF valuation is the fact that it provides a linchpin to link various fields of finance." "Developing an Automated discounted Cash Flow Model." *The Valuation Handbook: Valuation Techniques from Today's Top Practitioners*. Ed. Rawley Thomas and Benton E. Gup. Hoboken: John Wiley & Sons, 2010. 110.

[8]     "While discounted cash flow valuation is only one of the three ways of approaching valuation and most valuations done in the real world are relative valuations, it is the foundation on which all other valuation approaches are built. To do relative valuation correctly, we need to understand the fundamentals of discounted cash flow valuation." Damodaran, Aswath. "Approaches to Valuation." *Investment Valuation*. 2nd ed. 11.

[9]     Steven M. Davidoff, Fairness Opinions, 55 AM. U. L. REV. 1557, 1573-78 (2006).

1    underlying inputs to the analysis were unjustifiably low.

2        80.    The July Projections also depressed Avalara's valuation under Goldman Sachs'

3    selected transaction analysis, which appraised Avalara's value at 7.0x to 12.0x of the Company's next

4    twelve months of projected revenue and stated that Avalara common stock had a present value of

5    "$79.08 to $132.25" per share.

6        81.    As set forth above, because the July Projections inappropriately reduced Avalara's

7    2022E and 2023E revenue in comparison to projections genuinely reflective of the Company's revenue

8    growth rate inclusive of both the Company's organic and inorganic standalone growth, the present

9    value per share for Avalara set forth in the selected transaction analysis was false and misleading.

10       82.    Accordingly, the foregoing implied present values for Avalara stock induced

11   shareholders to sell their stock at less than fair value. By making Avalara seem relatively less valuable,

12   the Proxy cast Vista's offer in a misleadingly favorable light and thereby deceived shareholders.

13          **D.    Avalara Shareholders Suffered Financial Harm as a Result of the False
                    and Misleading Proxy**
14

15       83.    The Proxy caused Avalara's stockholders harm by inducing them to accept a merger that

16   underpriced the Company and therefore failed to compensate stockholders for the inherent value of their

17   shares. Moreover, since the acquisition could not have occurred without the approval of Company

18   shareholders, the Proxy was an essential link in the accomplishment of the sale and the misleading

19   statements were the cause of the Class's economic loss.

20       84.    First, Defendants sold the Company for less on a per share basis than the lowest analyst

21   valuation analyses available in August 2022, which valued Avalara stock in the range of $100-155 per

22   share. I.e., without even accounting for a transaction premium, *all* expert analysts covering the Company

23   predicted Avalara would reach significantly higher than $93.50 per share.

24       85.    Notably, Goldman Sachs opted to not provide any analysis or summary of these analyst

25   price targets, leaving shareholders in the dark about "Street" valuations of the Company and the

26   acquisition's lack of value. Analyst reports are proprietary and not easily accessible to the public even in

27   summarized form, with even secondhand descriptions of their contents often only available on boutique

financial media websites. Goldman Sachs' decision to ignore these reports is a strong signal that Avalara was worth far more than Vista paid.

86.     Second, the valuation analyses Goldman Sachs prepared for Avalara were predicated on unfairly low estimates of the Company's future growth that failed to accurately describe the Company's growth prospects. The growth rates implied by the July Projections were significantly lower than the Company's historical and recent growth rates, and failed to capture growth resulting from opportunistic M&A transactions by the Company.

87.     Third, because the misleading July Projections and the above-identified valuation analyses were used to support Goldman Sachs' issuance of a fairness opinion for the transaction, and because the Board would not have proceeded with the transaction without a fairness opinion, the July Projections and foregoing valuation analyses allowed the Board to enter into a deal that was unfair to shareholders and then use the Proxy to misrepresent the value of the acquisition.

88.     Fourth, Defendants' conduct caused Company shareholders to lose out on alternative options that offered greater value, including standalone growth or seeking better offers from alternative bidders, including potential stock transactions with strategic acquirors that would have allowed shareholders (and not just Company management) to continue participating in the strong future growth of the Company.

89.     At bottom, if Company shareholders had been informed of Avalara's true value at the time of the acquisition, the Board would have been unable to obtain a fairness opinion from Goldman Sachs, and Avalara shareholders would not have voted to approve the Merger offering them $93.50 per share.

90.     Accordingly, Avalara shareholders suffered damages in the amount of the difference between the price received in the Merger and the intrinsic value of their shares as calculated in accordance with recognized methods of valuation.

## CLASS ACTION ALLEGATIONS

91.     Plaintiff brings this class action pursuant to Fed. R. Civ. P. 23 on behalf of himself and the other public stockholders of Avalara (the "Class"). Excluded from the Class are Defendants

1 herein and any person, firm, trust, corporation, or other entity related to or affiliated with any

2 Defendant.

3     92.    This action is properly maintainable as a class action because:

4     (a)    the Class is so numerous that joinder of all members is impracticable. As of

5 September 8, 2022, the record date to vote on the Merger, there were 88,557,882 shares of Avalara

6 common stock outstanding, held by hundreds to thousands of individuals and entities throughout

7 the country. The actual number of former public stockholders of Avalara will be ascertained

8 through discovery;

9     (b)    there are questions of law and fact that are common to the Class that predominate

10 over any questions affecting only individual members, including the following:

11     i.   whether Defendants misrepresented material information in the Proxy in

12     violation of Section 14(a) of the Exchange Act;

13     ii.   whether the Defendants violated Section 20(a) of the Exchange Act; and

14     iii.   whether the Class suffered damages.

15     (c)    Plaintiff is an adequate representative of the Class, has retained competent counsel

16 experienced in litigation of this nature, and will fairly and adequately protect the interests of the

17 Class;

18     (d)    Plaintiff's claims are typical of the claims of the other members of the Class and

19 Plaintiff does not have any interests adverse to the Class;

20     (e)    the prosecution of separate actions by individual members of the Class would create

21 a risk of inconsistent or varying adjudications with respect to individual members of the Class,

22 which would establish incompatible standards of conduct for the party opposing the Class;

23     (f)    Defendants have acted on grounds generally applicable to the Class with respect to

24 the matters complained of herein, thereby making appropriate the relief sought herein with respect

25 to the Class as a whole; and

26     (g)    a class action is superior to other available methods for fairly and efficiently

27 adjudicating the controversy.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

**COUNT I**
**Violations of Section 14(a) of the Exchange Act and Rule 14a-9**
**(Against All Defendants)**

3        93.       Plaintiff realleges the allegations set forth above as if fully set forth herein.

4        94.       Section 14(a)(1) of the Exchange Act makes it "unlawful for any person, by the use of

5   the mails or by any means or instrumentality of interstate commerce or of any facility of a national

6   securities exchange or otherwise, in contravention of such rules and regulations as the Commission may

7   prescribe as necessary or appropriate in the public interest or for the protection of investors, to solicit or

8   to permit the use of his name to solicit any proxy or consent or authorization in respect of any security

9   (other than an exempted security) registered pursuant to section 78l of this title." 15 U.S.C. § 78n(a)(1).

10       95.       Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act,

11  provides that proxy communications shall not contain "any statement which, at the time and in the light

12  of the circumstances under which it is made, is false or misleading with respect to any material fact, or

13  which omits to state any material fact necessary in order to make the statements therein not false or

14  misleading." 17 C.F.R. § 240.14a-9.

15       96.       Defendants issued the Proxy to solicit Avalara shareholders' support for the Merger.

16  Each of the Defendants reviewed and authorized the dissemination of the Proxy, which misrepresented

17  and omitted the above-referenced material information, which in turn rendered the above-referenced

18  sections of the Proxy materially false, misleading, and incomplete because such sections provided a false,

19  misleading, and incomplete valuation picture of Avalara. The Proxy contained untrue statements of fact

20  and/or omitted material facts necessary to make the statements made not misleading.

21       97.       Each of the Individual Defendants, by virtue of their roles as officers and/or directors of

22  Avalara, and as alleged above, were aware of the Avalara valuation information but failed to ensure such

23  information was disclosed in the Proxy in a non-misleading fashion, in violation of Section 14(a) and

24  Rule 14a-9. The Individual Defendants knew that the Proxy was materially false, misleading, and

25  incomplete in regard to the above-referenced material information. The Individual Defendants reviewed

26  and relied upon the material information identified above in connection with their decision to approve

27  and recommend the Merger; indeed, the Proxy states that Goldman Sachs reviewed and discussed its

BRESKIN │ JOHNSON │ TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1  financial analyses with the Board, and further states that the Board considered both the financial analyses

2  provided by Goldman Sachs as well as its fairness opinion and the assumptions made and matters

3  considered in connection therewith. Further, the Individual Defendants were privy to and had knowledge

4  of the true facts concerning the process involved in selling Avalara and Avalara's true value, which was

5  far greater than the consideration the Company's former public shareholders received.

6  98.    The Individual Defendants knew that the material information identified above had been

7  misrepresented and/or omitted in the Proxy, rendering the sections of the Proxy identified above to be

8  materially false, misleading, and/or incomplete. Indeed, the Individual Defendants were required to

9  review Goldman Sachs' valuation analyses, question Goldman Sachs as to its derivation of fairness, and

10  to be particularly attentive to the procedures followed in preparing the Proxy and review it carefully

11  before it was disseminated, to corroborate that there were no material misstatements or omissions. After

12  reviewing both the underlying materials and the Proxy, the Individual Defendants failed to provide a

13  non-misleading proxy solicitation.

14  99.    Each of the Individual Defendants was responsible for ensuring that the Proxy was not

15  misleading, but failed to do so.

16  100.    Avalara is liable for violations of the Exchange Act as the issuing entity of the Proxy and

17  based on the Individual Defendants' violations of the Exchange Act.

18  101.    The above-referenced information that was mispresented and omitted in the Proxy was

19  material to Plaintiff and the Class, who were deprived of their right to cast an informed vote because such

20  misrepresentations and omissions were not corrected prior to the vote on the Merger and rendered the

21  above-refenced sections of the Proxy materially false, misleading, and incomplete.

22  102.    As a direct and proximate result of the dissemination of the materially false, misleading,

23  and incomplete Proxy that Defendants used to obtain shareholder approval of the Merger, Plaintiff and

24  the Class have suffered damages and actual economic losses (i.e., the difference between the value they

25  received as a result of the Merger and the true value of their shares at the time of the Merger) in an amount

26  to be determined at trial. By reason of the misconduct detailed herein, Defendants are liable pursuant to

27  Section 14(a) of the Exchange Act and SEC Rule 14a-9.

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

**COUNT II**
**Violations of Section 20(a) of the Exchange Act**
**(Against the Individual Defendants)**

103.     Plaintiff realleges the allegations set forth above as if fully set forth herein.

104.     The Individual Defendants acted as controlling persons of Avalara within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their positions as officers and/or directors of Avalara, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false, misleading, and incomplete statements contained in the Proxy filed with the SEC, the Individual Defendants had the power to influence and control – and did influence and control – directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially false, misleading, and incomplete.

105.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

106.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The Proxy at issue contains the unanimous recommendation of each of the members of the Board to approve the Merger. Moreover, as members of the Board, each of the Individual Defendants is responsible for signing the Proxy "By order of the Board of Directors." They were thus directly involved in preparing this document.

107.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in (i) negotiating, reviewing, and/or approving the Merger and (ii) preparing, reviewing, and/or approving the July Projections. The Proxy describes the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

108.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a) of the

BRESKIN | JOHNSON | TOWNSEND PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1    Exchange Act.

2         109.    As set forth above, the Individual Defendants had the ability to exercise control over and

3    did control a person or persons who have each violated Section 14(a) and Rule 14a-9 by their acts and

4    omissions as alleged herein. By virtue of their positions as controlling persons, the Individual Defendants

5    are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Individual

6    Defendants' conduct, Plaintiff and the Class have suffered damages and actual economic losses (*i.e.,* the

7    difference between the value they received as a result of the Merger and the true value of their shares at

8    the time of the Merger) in an amount to be determined at trial.

9                              **PRAYER FOR RELIEF**

10   WHEREFORE, Plaintiff prays for judgment and relief as follows:

11        A.      Declaring that this action is properly maintainable as a Class Action and certifying

12   Plaintiff as Class Representative and his counsel as Class Counsel;

13        B.      Awarding Plaintiff and the Class compensatory and/or rescissory damages

14   sustained as a result of Defendants' wrongdoing, including, but not limited to, pre-judgment and

15   post-judgment interest;

16        C.      Granting Plaintiff and the Class the costs and disbursements of this action, including

17   reasonable attorneys' fees, expert fees, and expenses;

18        D.      Awarding extraordinary and/or equitable relief as permitted by law, equity, and the

19   federal statutory provisions sued upon hereunder; and

20        E.      Granting such other and further relief as this Court may deem just and proper.

21

22

23

24

25

26

27

CLASS ACTION COMPLAINT - 31

**BRESKIN | JOHNSON | TOWNSEND** PLLC
1000 Second Avenue, Suite 3670
Seattle, Washington 98104  Tel: 206-652-8660

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

Dated: November 4, 2022

**OF COUNSEL**

**MONTEVERDE & ASSOCIATES PC**
Juan E. Monteverde
Jonathan T. Lerner
The Empire State Building
350 Fifth Avenue, Suite 4405
New York, NY 10118
Tel.: (212) 971-1341
jmonteverde@monteverdelaw.com
jlerner@monteverdelaw.com

*Attorneys for Plaintiff*
*Pro Hac Vice Forthcoming*

Respectfully submitted,

**BRESKIN JOHNSON TOWNSEND, PLLC**

By: s/Roger M. Townsend_____
     Roger M. Townsend, WSBA #25525
     1000 Second Avenue, Suite 3670
     Seattle, WA 98104
     Tel: (206) 652-8660
     rtownsend@bjtlegal.com

*Counsel for Plaintiff*