UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTIN SOHOVICH, | CASE NO. C22-1580 MJP |
| Plaintiff, | ORDER GRANTING DEFENDANTS' MOTION TO DISMISS |
| v. | |
| AVALARA, INC., et al., | |
| Defendants. | |

This matter comes before the Court on Defendants' Motion to Dismiss. (Dkt. No. 45.) Having reviewed the Motion, the Response (Dkt. No. 49), the Reply (Dkt. No. 52), and all supporting materials, and having held oral arguments on September 28, 2023, the Court GRANTS the Motion to Dismiss and DISMISSES the Amended Complaint.

## BACKGROUND

Martin Sohovich, an investor in Avalara, Inc., alleges that Avalara and its Board of Directors (which includes Avalara's CEO) misled investors as to the fairness of Avalara's $8.4 billion sale in August 2022 to a private investor—Vista Equity Partners Management, LLC.

1   Sohovich alleges the Proxy distributed to the investors to vote on the sale to Vista contained

2   misleading and false statements that misrepresented the fair value of Avalara and violated

3   Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act). The Court

4   reviews the Amended Complaint's (Dkt. No. 37 ("AC")) allegations about Avalara, the Proxy,

5   and the sale to assess the merits of Defendants' Motion to Dismiss.

6   **A.   Avalara's business**

7        "Avalara is a leading provider of cloud-based tax compliance software that automates the

8   routine transactional tax work traditionally performed by a company's tax or legal department."

9   (AC ¶ 2.) A successful business, Avalara has grown substantially, particularly from 2015

10  through 2021 where its total annual revenues grew at a compound annual growth rate of 33.6%.

11  (Id. ¶ 43.) Avalara has grown by increasing its customer base and by acquiring other companies.

12  From Q1 2018 through Q2 2022, Avalara added an average of 750 customers per quarter. (Id. ¶

13  44.) And through its acquisition strategy, Avalara acquired twenty-eight companies from 2007 to

14  2021, including twelve between 2018 to 2021. (Id. ¶ 46.) Avalara's management, included

15  Defendant Scott McFarlane, the CEO and Board Chair, often told investors that "M&A is part of

16  Avalara's DNA." (Id. ¶ 48)

17        Leading up to its August 2022 sale, Sohovich alleges that Avalara's management

18  maintained a positive outlook and touted the Company's strong sales, competitive advantages,

19  acquisition strategy, and low volatility even in the face of a cooling economy. (AC ¶¶ 48- 53.)

20  Sohovich supports these allegations with statements Avalara's management made on earnings

21  calls for Q4 2021 and Q1 2022 (February and May 2022, respectively) and at an "Analyst Day"

22  event in late June 2022. (Id. ¶ 4.) During the earnings calls, Avalara's management described its

23  ongoing acquisition strategy, its belief in the Company's strong long-term business outlook, and

24

the Company's strength in the face of economic downturn. (Id. ¶¶ 48-53.) Although Avalara faced uncertainty about continued business with a European customer/partner ("Partner A"), Avalara's management downplayed its significance on earnings calls for Q4 2021 and Q1 2022, stating that Partner A contributed "less than 4% of revenue." (Id. ¶ 54.) And at the Analyst Day event, Avalara's management touted the Company's resilience, its desire to engage in acquisitions, and its targets for increased revenues and margins. (Id. ¶¶ 56-62.)

**B.      Avalara Considers a Sale**

In response to interest from four private equity firms, Avalara's Board commenced a sale process in April 2022. (AC ¶ 63.) Sohovich alleges that the private equity interest stemmed from Avalara's stock drop, which was "driven by macroeconomic trends rather than a decline in the Company's performance." (Id.) The stock drop was significant, with shares falling from $165 per share on December 31, 2020 to $71 per share on June 30, 2022. But Sohovich notes that over the same time period, Avalara maintained its high margins and "its total revenues skyrocketed 108%." (Id. ¶ 64.)

As part of the sale process, Avalara's management prepared projections for 2022-2025, which Sohovich refers to as the "May Projections." (AC ¶ 68.) Sohovich alleges that the May Projections were inaccurate because they project lower revenues due to challenges and risks that the Company publicly downplayed on the Q4 2021 and Q1 2022 earnings calls. (Id.) And "there [was] no indication that the May Projections contemplated future M&A activity, though the Company has always made clear that acquisitions are a 'part of its DNA.'" (Id.) The Board approved the projections in late May, and provided them to Avalara's financial advisor, Goldman Sachs, and the interested private equity firms. (Id. ¶¶ 70-71.)

1        Of the potential acquirers, only two—Vista and "Party A"—submitted indications of

2 interest. On June 23, 2022, Vista expressed an interest in acquiring Avalara at a range between

3 $97-$101 per share, while Party A valued Avalara between $90-$95 per share. (AC ¶ 71; Proxy

4 at 39 (attached as Ex. 10 to the Declaration of Mike Rusie (Dkt. No. 46)).) According to the

5 Proxy, between July 6 and 10, Avalara's management privately provided Vista and Party A with

6 "a summary of Avalara's performance in the second quarter of 2022, which was below

7 management's expectations for revenue, representing the first quarter since Avalara's initial

8 public offering where Avalara would not beat public market analysts' expectations on revenue,

9 except for its earnings guidance released in May 2020 as a result of uncertainty around the

10 COVID-19 pandemic, and increase its revenue guidance for the year, and the effect of such

11 performance on Avalara's expected performance for the remainder of the 2022 fiscal year."

12 (Proxy at 40.) But, as Sohovich points out, the Q2 2022 revenues were $208.6 million, which fell

13 within management's public guidance of $208 to $210 million for the same quarter. (AC ¶ 73.)

14        Avalara received no definitive proposals by the July 14th deadline it had set. (AC ¶ 71.)

15 Party A withdrew from the sales process on July 12, 2022 because: (1) "Avalara's second quarter

16 results were below management's expectations for revenue," (2) Party A believed "that

17 Avalara's results for the remainder of the 2022 fiscal year would also be below expectations,"

18 and (3) "general macroeconomic conditions were uncertain and unfavorable." (Proxy at 41; see

19 AC ¶ 71.) Vista did not meet the July 14th deadline, citing its need for more time to formulate a

20 bid given "Avalara's second quarter results being below management's expectations for revenue,

21 [its] belief that Avalara's results for the remainder of the 2022 fiscal year would also be below

22 expectations, the deterioration in the financial markets and [its] need to contact additional

23 financing sources and continue discussions with existing financing sources to obtain the

24

financing that would be necessary to acquire Avalara." (Proxy at 41; AC ¶ 71.) The Board then terminated the sales process on July 16, 2022, even though Goldman Sachs told it that several other private equity firms had expressed interest in bidding. (Id.)

On July 18, 2022, Vista contacted Goldman Sachs to express its continued interest in acquiring Avalara. (Id. at ¶ 72.) That same day, Avalara's management presented, and the Board approved, a revised set of projections (the "July Projections") that lowered estimated annual revenues by 4% as compared to the May Projections. (AC ¶ 73.) According to the Proxy, management updated the May Projections "to take into account Avalara's performance in the second quarter of 2022 and the effect of such performance on Avalara's expected performance for the remainder of the 2022 fiscal year and the remainder of the forecast period, including a reduction in the growth of new and upsell bookings as a result of execution challenges and sales capacity issues, which reduction was expected to increase in the remainder of fiscal year 2022, high attrition in Avalara's sales and marketing departments, the expected further reduction, and likely eventual elimination, in revenue from its relationship with Partner A and additional challenges in Avalara's business." (Proxy at 42.) Partner A refers to an entity that Avalara had attempted, but failed, to acquire—an effort formally terminated by June 24, 2022. (Id. at 39.) The Proxy explained that Avalara's "management also discussed with the Board the likely need to revise Avalara's public guidance, including a reduction in expected revenue and, by a smaller amount, an increase in non-GAAP operating income, as a result of Avalara's performance in the second quarter of 2022 and the effect of such performance of Avalara's expected performance for the remainder of the 2022 fiscal year." (Id. at 42.)

Without seeing the July Projections, Vista submitted a revised indication of interest on July 19, 2022, at $91 per share—roughly 10% below its initial indication. (AC ¶ 74.) This was

1    also well below Goldman Sachs' $109 per share price target it set after reviewing the Q2

2    results—though Sohovich fails to state when Goldman Sachs expected the stock to reach that

3    target. (Id. ¶¶ 83, 108-09.) Goldman Sachs informed Vista that the indication was unlikely to

4    receive interest from the Board. (Id. at ¶ 74.) Vista told Goldman Sachs "that, while Avalara's

5    second quarter results were below management's expectations for revenue and Vista believed

6    that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations,

7    Vista could potentially offer an increased price but that it would need to complete its diligence

8    and to contact additional financing sources to obtain the financing that would be necessary to

9    acquire Avalara, particularly given that the financial markets had continued to deteriorate."

10   (Proxy at 42.)

11          On July 21, 2022, the Board met with Avalara's senior management and Goldman Sachs,

12   and determined it would only consider a valuation between $97-$101 per share—a fact which

13   McFarlane communicated to Vista on August 3rd. (AC ¶ 75.) On August 4, Vista raised its offer

14   to $92.25 per share. (Id. ¶ 76.) On August 5, the Board reviewed the offer and instructed

15   Goldman to tell Vista that it would agree to a non-compete (or "no-shop") provision excluding

16   other bidders if Vista raised its proposal to $95 per share. (Id. ¶ 77.) Goldman communicated this

17   to Vista, but with a higher price of $95.75 per share. (Id. ¶ 78.) Vista rejected this proposal and

18   communicated its "best and final" offer of $93.50 per share with a "no-shop" provision. On

19   August 7, 2022 Goldman sent Vista the July Projections and communicated its opinion that the

20   share price and valuation was fair. (Id. ¶ 80.) The Board then approved the merger agreement on

21   August 8, 2022 and publicly announced the transaction. (Id. ¶ 81.)

22          Sohovich alleges that Avalara's management and outside Directors stood to receive more

23   than $65 million from the deal and that Goldman would be paid $70 million. (AC ¶¶ 66, 78.) He

24

1    also alleged that McFarlane stood to benefit by retaining his position as CEO and $30 million in

2    cash, equity, and benefits. (Id. ¶¶ 25, 66, 106.) Sohovich also identifies two other directors who

3    had links to Vista—both were on boards of companies taken private by Vista. (Id. at ¶¶ 30, 33.)

4    But Sohovich does not argue that these two individuals stood to gain anything from Vista's

5    acquisition of Avalara.

6    **C.    Alleged Misstatements in the Proxy**

7        Although the Amended Complaint alleges the Proxy contained at least four

8    misstatements, Sohovich's opposition brief narrows it to just three. (AC ¶¶ 86-106; see Pl. Resp.

9    at 12-23.)

10        First, Sohovich alleges that the Proxy falsely told investors "'[the May and July

11   Projections were] prepared on a reasonable basis, reflect[] the best currently available estimates

12   and judgments, and present[], to the best of management's knowledge and belief, the expected

13   course of action and the expected future financial performance of Avalara.'"

14   (AC ¶ 87 (quoting Proxy at 62-63).) Sohovich argues that the "statement was false and

15   misleading because Avalara management did not legitimately believe that the May and July

16   Projections (i) were prepared on a reasonable basis, (ii) reflected the best currently available

17   estimates, and (iii) presented to the best of management's knowledge and belief, the expected

18   financial performance of Avalara." (Id.) Sohovich alleges that "Avalara management did not

19   legitimately hold such belief because the May and July Projections were based on purported

20   operational and other 'challenges' and 'weaknesses' that directly contradicted Avalara senior

21   management's public statements" that Sohovich lists in a table." (Id.) Sohovich also argues that

22   the "projections dramatically undervalued Avalara considering its historical growth rate [and]

23   recent growth rate" and that they "failed to take future M&A activity into account . . . instead

24

1    extrapolating from an atypical quarter (Q222) during which Avalara had no inorganic growth."

2    (Resp. at 13.) Sohovich points out that Avalara consistently touted that M&A was "part of

3    Avalara's DNA," and that management confirmed its intent to "continu[e] to pursue value-

4    accretive M&A opportunities" after the sale to Vista. (AC ¶ 81 (emphasis omitted).)

5           Second, Sohovich alleges the Proxy's statement that Avalara's performance for Q2 2022

6    was "below management's expectations for revenue" was false because the Q2 revenues actually

7    fell within management's public guidance. (AC ¶ 88.) As Sohovich points out, the Q2 2022

8    results were $208.6 million, which was within management's public guidance and only slightly

9    lower than the "consensus" among analysts of $209.1 million. (Id. ¶ 73.)

10          Third, Sohovich alleges the Proxy mislead shareholders by citing short-term challenges

11   and risks that "directly contradicted roughly contemporaneous statements [from] Avalara senior

12   management" downplaying those same risks. (AC ¶ 90.) In support, Sohovich provides a chart

13   identifying the statements in the Proxy that he alleges are contradicted by statements from the Q4

14   2021 and Q1 2022 earnings calls and Analyst Day event. (Id. ¶ 91.)

15   **D.   Loss Causation**

16          Sohovich asserts that the Proxy-approved sale caused him and other Avalara shareholders

17   an economic loss because they received less than the full, fair value for their shares of Avalara

18   stock. (AC ¶¶ 107-113.) First, Sohovich alleges that the Proxy was an essential link in the sale of

19   the company to Vista, in satisfaction of "transactional causation." (Id. ¶ 107.) Second, he alleges

20   that Goldman Sachs' fairness opinion presented an inaccurate valuation of Avalara because it

21   relied on the artificially deflated July Projections that could not be reconciled with Avalara's

22   public statements and actual revenues or with Goldman Sachs' July 14th price target of $109 per

23   share. (Id. ¶¶ 83, 108-09.) Third, Sohovich alleges that the July Projections and Goldman Sachs'

24

fairness opinion "caused the Board to enter into a deal that was unfair to shareholders." (Id. ¶ 110.) Fourth, Sohovich alleges that shareholders lost out on alternative options that offered greater value, including not selling the Company or seeking additional potential acquirers—including hearing from those who reached out to Goldman. (Id. ¶ 111.)

## ANALYSIS

**A.    Section 14(a) Claim Elements and Motion to Dismiss Standard**

Section 14(a) of the Exchange Act and SEC Rule 14a–9 "disallow the solicitation of a Proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000); see also 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9(a). "To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish that '(1) a Proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the Proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" N.Y.C. Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting Tracinda Corp. v. DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007)), overruled on other grounds by Lacey v. Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc)." For a statement to be false or misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[ ] material information.'" Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022) (considering Section 10(b) claims and quoting Khoja v. Orexigen Therapeutics, Inc., 899 F.3d 988, 1008–09 (9th Cir. 2018)).

The Private Securities Litigation Reform Act (PSLRA) requires a plaintiff stating a claim under Section 14(a) to: (1) "specify each statement alleged to have been misleading, the reason

or reasons why the statement is misleading, and, if an allegation regarding the statement or

omission is made on information and belief, ... all facts on which that belief is made," 15 U.S.C.

§ 78u–4(b)(1)(B); (2) "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind," id. § 78u–4(b)(2)(A); and (3) establish that "the

act or omission of the defendant alleged to violate this chapter caused the loss for which the

plaintiff seeks to recover damages," id. § 78u–4(b)(4), that is, plead "loss causation," Stoneridge

Inv. Partners v. Sci.–Atlanta, 552 U.S. 148, 165 (2008).

If alleged material misrepresentations are premised on opinion statements, the plaintiff

must identify both the objective and subjective falsity of the misrepresentations. City of

Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615 (9th

Cir. 2017). But there are "three different standards for pleading falsity of opinion statements." Id.

"First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege

both that 'the speaker did not hold the belief she professed' and that the belief is objectively

untrue." Id. (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575

U.S. 175, 185-86 (2015)). "Second, when a plaintiff relies on a theory that a statement of fact

contained within an opinion statement is materially misleading, the plaintiff must allege that 'the

supporting fact [the speaker] supplied [is] untrue.'" Id. (quoting Omnicare, 575 U.S. at 186).

"Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to

the basis for the [defendant's] opinion ... whose omission makes the opinion statement at issue

misleading to a reasonable person reading the statement fairly and in context.'" Id. (quoting

Omnicare, 575 U.S. at 194).

Lastly, in ruling on Defendants' motion under Fed. R. Civ. P. 12(b)(6), the Court must

construe the complaint in the light most favorable to the non-moving party and accept all

1    well-pleaded allegations of material fact as true. <u>Livid Holdings Ltd. v. Salomon Smith Barney,</u>

2    <u>Inc.</u>, 416 F.3d 940, 946 (9th Cir. 2005); <u>Wyler Summit P'ship v. Turner Broad. Sys.</u>, 135 F.3d

3    658, 661 (9th Cir. 1998). Dismissal is appropriate only where a complaint fails to allege "enough

4    facts to state a claim to relief that is plausible on its face." <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S.

5    544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that

6    allows the court to draw the reasonable inference that the defendant is liable for the misconduct

7    alleged." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678 (2009). As the Parties agree, Sohovich need only

8    satisfy Rule 8, and not Rule 9, because he pursues only negligence-based claims. But because the

9    PSLRA applies, Sohovich must plead with particularity the facts showing the falsity of the

10   statements and the requisite state of mind. 15 U.S.C. § 78u–4(b). No scienter is required—only a

11   negligent state of mind is required. <u>See</u> <u>Knollenberg v. Harmonic, Inc.</u>, 152 F. App'x 674, 682

12   (9th Cir. 2005).

13   **B.    Sohovich Fails to Plead a Viable Section 14(a) Claim**

14          In this section, the Court examines whether Sohovich has adequately alleged falsity,

15   materiality, and Defendants' mental state as to each statement. The Court finds flaws requiring

16   dismissal of the claims premised on each statement.

17          **1.    Statement Regarding the May and July Projections**

18          The first allegedly false statement in the Proxy is that "'[the May and July Projections

19   were] prepared on a reasonable basis, reflect[] the best currently available estimates and

20   judgments, and present[], to the best of management's knowledge and belief, the expected course

21   of action and the expected future financial performance of Avalara." (AC ¶ 87 (quoting Proxy at

22   62-63).) Before addressing the Section 14(a) elements, the Court analyzes whether this statement

23   falls within the PSLRA's safe harbor for forward-looking statements.

24

1

### a.    PSLRA Safe Harbor

2       "The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-

3  looking statement, which is any statement regarding (1) financial projections, (2) plans and

4  objectives of management for future operations, (3) future economic performance, or (4) the

5  assumptions underlying or related to any of these issues." Police Ret. Sys. of St. Louis v.

6  Intuitive Surgical, Inc., 759 F.3d 1051, 1058 (9th Cir. 2014) (citation and quotation omitted). A

7  forward-looking statement falls within the safe harbor when it is "(i) identified as a forward-

8  looking statement, and is accompanied by meaningful cautionary statements identifying

9  important factors that could cause actual results to differ materially from those in the forward-

10  looking statement," or (ii) if it is not identified as a forward-looking statement and not

11  accompanied by cautionary language, "made with actual knowledge . . . that the statement was

12  false or misleading." 15 U.S.C. § 78u–5(c)(1); see Intuitive Surgical, 759 F.3d at 1058; In re

13  Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1141 (9th Cir. 2017).

14       But statements which mix forward-looking with non-forward-looking statements about

15  "past or current" facts cause the non-forward looking statement to fall outside of the safe harbor.

16  See In re Quality Sys., 865 F.3d at 1141. "[A] defendant may not transform non-forward-looking

17  statements into forward-looking statements that are protected by the safe harbor provisions of the

18  PSLRA by combining non-forward-looking statements about past or current facts with forward-

19  looking statements about projected revenues and earnings." Id. In a mixed statement, the

20  forward-looking portion will fall within the safe harbor only if, "examined as a whole, the

21  challenged statements relate[ ] to future expectations and performance." Intuitive Surgical, 759

22  F.3d at 1059 (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010)).

23       The Court here finds that three portions of the first statement are actionable, non-forward

24  looking statements that fall outside of the PSLRA's safe harbor.

1    The first non-forward-looking component is that the May and July Projections were

2    "prepared on a reasonable basis." The basis on which the Projections were prepared include

3    management's then-current knowledge about Avalara's existing strengths and weakness, as well

4    as its current and planned strategies. If, as Sohovich alleges, the May and July Projections

5    improperly omitted any future revenue from Avalara's existing M&A strategy or

6    mischaracterized the Q2 revenues, then the statement misrepresented an existing fact and is not

7    forward looking.

8    The second non-forward-looking component of the statement is that the May and July

9    Projections "reflect the best currently available estimates and judgments." This is not a forward-

10   looking statement because it speaks to management's then-existing estimates and judgments,

11   which could be misleading if they are shown to be false. For example, if Sohovich can prove that

12   management planned to continue its M&A activity and wrongly ascribed no future revenue to

13   such activity, it could prove the statement false. This statement is separate from the projections

14   themselves, and remains actionable. See Baum v. Harman Int'l Indus., Inc., 408 F. Supp. 3d 70,

15   83 (D. Conn. 2019) (noting that the safe harbor does not apply to the "failure to disclose the fact

16   that the Management Projections did not account for acquisitions, if that fact were material").

17   The third non-forward-looking component of the statement is that the May and July

18   Projections show "to the best of management's knowledge and belief, the expected course of

19   action and the expected future financial performance of Avalara." To the extent this identifies

20   management's existing knowledge and belief, the statement is actionable and not forward

21   looking. For example, the statement could be shown to be untrue if management did, in fact, plan

22   to engage in M&A and wrongly omitted revenues from it. But to the extent the statement refers

23   to beliefs about future performance, it falls within the safe harbor as a forward looking statement

24

1    for which there are adequate risk disclosures. (See Proxy at 62-65; see, e.g., id. at 62 ("this

2    information is not fact and should not be relied upon as being necessarily indicative of future

3    results, and readers of this proxy are cautioned not to place undue reliance on the prospective

4    financial information.").)

5         There are strong parallels here with NECA-IBEW Pension Tr. Fund v. Precision

6    Castparts Corp., No. 3:16-cv-01756, 2017 WL 4453561, at *7 (D. Or. Oct. 3, 2017), report and

7    recommendation adopted, No. 3:16-cv-01756, 2018 WL 533912 (D. Or. Jan. 24, 2018). In

8    NECA, the proxy included statements that the revenue projections "reflected management's most

9    up-to-date and accurate forecasts" and "did not assume any acquisitions other than those that

10   were previously announced or completed because of the inherent uncertainty of consummating

11   acquisitions with third parties on terms that would be attractive to the Company or at all." Id. at

12   *11. The Court found those statements fell outside the safe harbor because they referred to the

13   company's existing plan to engage in acquisitions and its current or past condition. Id. Similarly,

14   Sohovich alleges that the projections omit revenues for M&A even though Avalara's

15   management had engaged and planned to engage in M&A at the time they formed the May and

16   July Projections.

17        The Court is not convinced by Defendants' reliance on another case where projection-

18   related statements fell within the safe harbor: Golub v. Gigamon Inc., 372 F. Supp. 3d 1033,

19   1048 (N.D. Cal. 2019), aff'd, 994 F.3d 1102 (9th Cir. 2021), and aff'd, 847 F. App'x 368 (9th

20   Cir. 2021). In Golub, the proxy stated that Gigamon's board believed that new financial

21   projections used to value the company were "a better reflection of [the company's] financial

22   outlook." Id. at 1046. The Court concluded that the projections were "classic forward-looking

23   statements because they pertain to revenues and other financial data, the accuracy of which

24

1    cannot be determined until after the projection period (assuming the Acquisition had not been

2    consummated and [the company] were still an independent entity)." Id. at 1048. And the Court

3    noted that there was no suggestion Gigamon changed its business strategy—it just had lower

4    actual revenues. Id. at 1047. Golub remains distinguishable because, as alleged, the statements

5    speak to Avalara's existing and planned strategy, not the specific future revenues.

6              **b.      Objective Falsity**

7              After considering Sohovich's three primary arguments in his response, the Court finds

8    Sohovich's allegations insufficient to show the objective falsity of the first statement.

9              First, Sohovich argues that the May and July Projections themselves are false because

10   "Avalara senior management based [them] on purported short-term challenges and weaknesses

11   identified in the Proxy that directly contradicted roughly contemporaneous statements Avalara

12   senior management made on earnings calls and on Analyst Day." (Pl. Resp. at 13.) Sohovich's

13   theory falls short because he tries to show objective falsity by comparing the Proxy statements to

14   prior statements of corporate puffery. The prior statements Sohovich identifies all concern

15   generalized optimism that are inactionable corporate puffery—i.e., "vague statements of

16   optimism like 'good,' 'well-regarded,' or other feel good monikers," that are easily devalued.

17   Intuitive Surgical, 759 F.3d at 1060 (citation and quotation omitted). Sohovich concedes that

18   puffery remains inactionable, but insists that he has identified "[n]umerically specific forecasts"

19   that are not puffery. (See Pl. Opp. at 15 (Dkt. No. 49 at 20) (citing Gammel v. Hewlett-Packard

20   Co., 905 F. Supp. 2d 1052, 1070 (C.D. Cal. 2012)).) But the only numerically-specific prior

21   statements concern the loss of revenue from Partner A, which was disclosed in the Proxy as

22   international-related risk, and appears to have been factored into the July Projections. Sohovich

23   fails to allege how the loss of revenues from Partner A were inappropriately factored into the

24   July Projections. The only other metrics Sohovich cites do not show falsity. For example,

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS - 15

1   Sohovich points to statements made at the Analyst Day event where management expected 20-

2   25% compound annual growth of revenues, 10-15% operating margins, and free cash flow at 13-

3   18% of revenue. (See AC ¶¶ 61, 95.) The May and July Projections either met or exceeded those

4   same projections, undermining any apparent falsity in the Proxy. (Id.) Sohovich has failed to

5   show how any public statements made prior to the sale make the May or July Projections

6   objectively false.

7          Second, Sohovich argues that the Projections were false because management "failed to

8   take future M&A activity into account when crafting either the May or July Projections, instead

9   extrapolating from an atypical quarter (2Q22) during which Avalara had no inorganic growth."

10  (Pl. Resp. at 13.) The Court remains unconvinced that this shows objective falsity. Sohovich has

11  successfully alleged that Avalara relied on M&A—part of the Company's "DNA"—to grow

12  revenues, and that it intended to continue that strategy after the merger. (See AC ¶¶ 48, 68, 81,

13  91.) But Sohovich has not adequately alleged that the May and July Projections omitted any

14  revenues from future acquisitions. At best, he alleges that "there is no indication that the May

15  Projections contemplated future M&A activity." (AC ¶ 68.) But this is not a concrete allegation

16  that the May and July Projections actually omit revenues to M&A activity. This undermines his

17  argument as to objective falsity. Even the projections omitted future M&A revenues, Sohovich

18  has not provided any reason why the omission of revenues would be false or misleading. As the

19  Proxy discloses, there were no acquisitions in the near or long-term horizon, and the hopes of

20  acquiring Company A had disappeared by late June before the sale in August. Nor has Sohovich

21  identified prior projections that included revenues or targets for M&A such that the May or July

22  Projections might have deviated from past practices. The facts here fall far afield from the

23  allegations found adequate to state a Section 14(a) claim in NECA. 2017 WL 4453561. There,

24

1    the company's projections used in the proxy omitted revenue from M&A despite: (1)

2    acquisitions being the company's "primary objective"; (2) previously disclosing dollar-figure

3    targets for acquisitions and previously preparing projections with future M&A revenues; and (3)

4    acquiring two companies just days after preparing the projections that omitted any M&A

5    revenues. Id. at *2-3, *7-8. This case is also distinguishable from Azar v. Blount Int'l, Inc.,

6    where the court found the proxy contained a materially misleading omission of revenue

7    projections that more accurately reflected the company's public statements about positive

8    quarterly revenues and instead relied on pessimistic projections developed management

9    developed to justify the sale. Id., No. 3:16-CV-483-SI, 2017 WL 1055966, at *5 (D. Or. Mar. 20,

10   2017). Here, there are no colorable allegations that Avalara's management failed to disclose the

11   existence of earlier, rosier projections. Lastly, Sohovich has identified no legal or accounting

12   principal that would have required Avalara to project revenues from future acquisitions. The

13   potential omission of revenues from the Projections for hypothetical future acquisitions does not

14   appear false or misleading even if Avalara maintained a strategy to engage in future M&A.

15         Third, Sohovich fails to convince the Court that Avalara's management misled investors

16   by creating the July Projections that lowered forecast revenues based on the loss of Partner A and

17   management's views on the Q2 2022 revenues. Sohovich first argues that because Avalara's

18   management had already told investors that the loss of Partner A was "not that huge an issue," it

19   was improper to lower the projections. (Pl. Resp. at 14.) But as Sohovich concedes, Partner A

20   accounted for 4% of Avalara's revenues. (Id.) So even if the loss of Partner A was not

21   qualitatively "huge," it did, in fact, account for 4% of the revenues—the same percent by which

22   Avalara reduced its projections. Moreover, the Proxy disclosed the fact that the July Projections

23   took "into account . . . the expected further reduction, and likely eventual elimination, in revenue

24

from its relationship with Partner A and additional challenges in Avalara's business." (Proxy at 41-42.) Sohovich also argues that the July Projection lowered revenues on the false pretense that the Q2 revenues fell below "management's expectations." Sohovich is correct that the Q2 revenues fell within management's public guidance. But he fails to convince the Court that management's public guidance is synonymous with its internal expectations. The Proxy specifically treats the two concepts distinctly. The Proxy first explains that "Avalara's second quarter results were below management's expectations for revenue" and that these internal conclusions were privately communicated to the Board and both Vista and Party A. It then explains that given the failure to meet management's expectations, the Company saw a "likely need to revise Avalara's public guidance, including a reduction in expected revenue . . . for the remainder of the 2022 fiscal year." (Id. at 42.) This shows that public guidance differed from the internal expectations of Avalara's management. Sohovich therefore fails to allege sufficient facts to show that the Proxy's discussion of management's disappointment was objectively false.

Given that Sohovich has failed to identify the objective falsity of the first statement, the Court GRANTS the Motion and DISMISSES the claims as to this statement.

c.    **Subjective Falsity**

Assuming solely for the sake of argument that Sohovich had alleged the statement was objectively false, he has only provided sufficient allegations of subjective falsity as to Defendant McFarlane. The statement at issue concerns Avalara's development of the May and July Projections. McFarlane is the only named defendant to be a member of the management team that developed them. In his capacity as CEO, McFarlane knew of and led Avalara's strategies, including the pre- and post-merger focus on acquisitions and he was knowledgeable about management's revenue expectations. (See AC ¶ 48 (p.14-17).) Had Sohovich properly identified the statement at issue to be objectively false, the allegations as to McFarlane would suffice to

1    show subjective falsity. But Sohovich fails to provide any particularized allegations as to

2    subjective belief of each outside Directors, who are not alleged to share the same intimate

3    knowledge about Avalara's development of the Projections. And the Court is not convinced that

4    the Board's mere approval of the projections shows subjective falsity.

5                    **d.    Materiality**

6            Notwithstanding Sohovich's failure to show the statement's objective falsity, the Court

7    finds it material.

8            False or misleading statements are actionable only if material. <u>Bell v. Cameron Meadows</u>

9    <u>Land Co.</u>, 669 F.2d 1278, 1281 (9th Cir. 1982). In order to establish materiality, a plaintiff must

10   show a substantial likelihood that the material misrepresentation would have "significantly

11   altered the total mix of information made available" to investors. <u>Basic Inc. v. Levinson</u>, 485

12   U.S. 224, 231–32 (1988). "A statement is misleading if it would give a reasonable investor the

13   impression of a state of affairs that differs in a material way from the one that actually exists."

14   <u>Retail Wholesale & Dep't Store Union Local 338 Ret. Fund v. Hewlett-Packard Co.</u>, 845 F.3d

15   1268, 1275 (9th Cir. 2017) (internal citations omitted).

16           Whether Avalara's management believed in the accuracy of the projections goes to the

17   heart of the overall fairness of the sale. The projected revenues impacted the Company's

18   valuation and the accuracy of Goldman Sachs' fairness opinion. The fairness opinion helped

19   justify and explain the Proxy's representation that the final price Vista offered was fair. This

20   renders the projections material, because Goldman Sachs' opinion would have impacted a

21   reasonable investor's belief as to the fairness of the sale. The allegations are sufficient to show

22   materiality.

23

24

### e.      Mental State

Assuming for the sake of argument that Sohovich had shown the falsity of the statement, the Court finds the allegations as to McFarlane's mental state sufficient.

McFarlane is alleged to have been intimately involved in the decisions around how the Projections were created. He made public statements about Avalara's overall acquisition strategy that Sohovich claims is at odds with the projections, and he was a member of Avalara's management sufficient to know whether the Q2 revenues missed expectations or not. And Sohovich has provided allegations that McFarlane had a motive to depress the revenue projections to accomplish the sale so that he could obtain $30 million in cash and benefits, while retaining his role as CEO. These allegations suffice to show the negligent state of mind. But, as explained, they do not rectify the failure to allege the statements' falsity.

### 2.      Statement Regarding the Q2 Revenue Results

Sohovich argues that the Proxy contained a false statement that Avalara's purported Q2 2022 revenues fell below management's expectations for revenue. The Court rejects this argument and finds the allegations inadequate. The Court GRANTS the Motion as to this claim and DISMISSES it.

### a.      Objective Falsity

As explained above in Section B(1)(b), Sohovich fails to provide sufficient allegations that the statement is false. For the same reasons set forth in Section B(1)(b), the Court GRANTS the Motion and DISMISSES the claims premised on this statement.

### b.      Subjective Falsity

Consistent with the Court's analysis in Section B(1)(c), the Court finds subjective falsity has been sufficiently alleged as to McFarlane only.

### c.    Materiality

Assuming for the sake of argument that Sohovich had alleged objective falsity, the Court finds this statement material. As Sohovich argues, the pessimism about the Q2 revenues was used to justify the lower July Projections and the acceptance of a sale price far lower than what Vista initially offered. The lower projections also impacted the accuracy of Goldman Sachs' fairness opinion, which, as the Court explains above in Section B(1)(d), is material.

### d.    Mental State

Assuming for the sake of argument that Sohovich had shown the objective falsity of the statement, the Court finds the allegations as to McFarlane's mental state sufficient. The same reasoning set forth in Section B(1)(e) supports the Court's conclusion here.

### 3.    Statements Regarding Risks

Sohovich argues that the Proxy contained false statements concerning Avalara's risks that justified the lower price. Sohovich alleges that the Proxy contained false and misleading statements about: (1) risks to long term success; (2) international risks; (3) competitive risk; (4) macroeconomic risk; (5) compliance requirements; (6) the lack of M&A growth; (7) and a reduction in upsell bookings. The Court finds these allegations inadequate.

### a.    Objective Falsity

The primary problem with Sohovich's theory is that he tries to show objective falsity by comparing the Proxy statements to prior statements of corporate puffery. As explained above in Section B(1)(b), the prior statements are too vague to show the falsity of the Proxy's risk disclosures and Sohovich has failed to provide any concrete numerical-driven statements that might undermine the Proxy's risk-related statements.

The Court briefly highlights the deficiencies as to each category of risk-related statements in the Proxy.

First, as to long-term success, the statements Sohovich identifies from prior public statements are too vague to show falsity. The prior public statements appear to be classic puffery that fail to show how the Proxy misled investors. The Court finds these statements inactionable.

Second, as to international risks, Sohovich has failed to allege anything misleading about the Proxy's statements. The Proxy disclosed the loss of revenues from Partner A, which aligns with the prior public statements about losing Partner A. While the prior statements suggested the loss would not be a "huge issue," these prior qualitative statements do not contradict the Proxy's disclosure of the actual loss of the revenues. The Proxy's statements are inactionable.

Third, as to competition, the Proxy's disclosure is not inconsistent with the prior public statements. The Proxy says that Avalara operates in a "highly competitive industry," while the prior statements suggest the Company has "limited competition" due to its "various competitive m oats that 'insulate us from competition.'" (AC ¶ 91 at p.45.) These statements are not contradictory. That Avalara had limited competition because of how it positioned itself does not mean that it does not also operate in a highly competitive industry. It simply means that it has positioned itself well in a competitive market. This statement has not been alleged to be false.

Fourth, the Proxy's disclosure of risks related to adverse economic conditions has not been sufficiently alleged to be false. The prior statements that Sohovich argues as the basis for the objective falsity are vague and pure puffery—that they are a "good company in good and in bad times" and have a "low beta" (volatility). These prior statements do not contradict the Proxy.

Fifth, the Proxy's disclosure about compliance requirements has not been adequately alleged to be false. The Court finds an absence of allegations that the prior statements contradict the Proxy or render its disclosure false.

1    Sixth, Sohovich suggests that the risks regarding growth from M&A were misleading, but

2    he fails to identify any specific statements. (See AC ¶ 91 at p.46.) This is fatal to the claim.

3    Seventh, Sohovich has failed to show that the statements in the Proxy about upsell

4    bookings is false. The Proxy disclosed that there was a reduction in upsell bookings as reflected

5    in the Q2 results. The prior public statements only speak to Q1 2022 upsell bookings, which do

6    not show the Proxy's disclosures were false or misleading. This is an apples-to-oranges

7    comparison.

8    In sum, Sohovich has failed to identify any objective falsity in the risk disclosures. The

9    Court therefore GRANTS the Motion as to these statements and DISMISSES the claims based

10   on them.

11                    **b.      Subjective Falsity, Materiality, and Mental State**

12   Even if the statements above have been alleged to be objectively false, Sohovich has

13   failed to explain why they are subjectively false, material, or why Defendants acted with a

14   negligent state of mind. This is an alternative basis on which the Court GRANTS the Motion.

15   **C.    Loss Causation**

16   Because Sohovich has not adequately alleged any misstatements in violation of Section

17   14(a) or 20(a), the Court declines to reach the question of loss causation.

18                                  **CONCLUSION**

19   Sohovich has failed to allege the falsity of all three statements and dismissal of his

20   Section 14(a) claims is appropriate. And because the Section 20(a) claims are dependent on a

21   viable Section 14(a) claim, they, too, must be dismissed. Given the pleading deficiencies that the

22   Court has identified, the Court GRANTS the Motion to Dismiss and DISMISSES the Amended

23   Complaint. Because Sohovich has asked for leave to amend and there is a possibility that

24

amendment could save the claims, the Court DISMISSES the claims in the Amended Complaint WITHOUT PREJUDICE. The Court GRANTS Sohovich's request for leave to amend. Any amendment must be filed within 21 days of entry of this Order.

The clerk is ordered to provide copies of this order to all counsel.

Dated October 6, 2023.

Marsha J. Pechman
United States Senior District Judge