UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

MARTIN SOHOVICH,

               Plaintiff,

    v.

AVALARA, INC., et al.,

               Defendants.

CASE NO. C22-1580 MJP

ORDER GRANTING SECOND
MOTION TO DISMISS

This matter comes before the Court on Defendants' Motion to Dismiss the Second
Amended Complaint. (Dkt. No. 61.) Having reviewed the Motion, Plaintiff's Opposition (Dkt.
No. 63), the Reply (Dkt. No. 64), and all supporting materials, the Court GRANTS the Motion
and DISMISSES this action WITH PREJUDICE. The Court finds this matter suitable for
decision without the requested oral argument.

**BACKGROUND**

Plaintiff Martin Sohovich, an investor in Avalara, Inc., alleges that Avalara and its Board
of Directors (which includes Avalara's CEO) misled investors as to the fairness of Avalara's

$8.4 billion sale in August 2022 to a private investor—Vista Equity Partners Management, LLC. Sohovich alleges the Proxy distributed to the investors to vote on the sale to Vista contained misleading and false statements that misrepresented the fair value of Avalara and violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act). The Court previously dismissed Sohovich's Amended Complaint, but granted leave to amend. (MTD Order (Dkt. No. 54).) Sohovich has filed a Second Amended Complaint (SAC) (Dkt. No. 57)), and Defendants again seek dismissal. The Court reviews the SAC's allegations about Avalara, the Proxy, and the sale to assess the merits of Defendants' Second Motion to Dismiss.

**A.    Avalara's business**

"Avalara is a leading provider of cloud-based tax compliance software that automates the routine transactional tax work traditionally performed by a company's tax or legal department." (SAC ¶ 2.) A successful business, Avalara has grown substantially, particularly from 2015 through 2021 where its total annual revenues grew at a compound annual growth rate of 33.6%. (Id. ¶ 43.) Avalara has grown by increasing its customer base and by acquiring other companies. From Q1 2018 through Q2 2022, Avalara added an average of 750 customers per quarter. (Id. ¶ 45.) And through its acquisition strategy, Avalara acquired twenty-eight companies from 2007 to 2021, including twelve between 2018 to 2021. (Id. ¶ 46.) Avalara's management, included Defendant Scott McFarlane, the CEO and Board Chair, often told investors that "M&A is part of Avalara's DNA." (Id. ¶ 48)

Leading up to Avalara's August 2022 sale, Sohovich alleges that Avalara's management maintained a positive outlook and touted the Company's strong sales, competitive advantages, acquisition strategy, and low volatility even in the face of a cooling economy. (SAC ¶¶ 48-53.) Sohovich supports these allegations with statements Avalara's management made on earnings

calls for Q4 2021 and Q1 2022 (February and May 2022, respectively) and at an "Analyst Day" event in late June 2022. (Id. ¶ 4.) During the earnings calls, Avalara's management described its ongoing acquisition strategy, its belief in the Company's strong long-term business outlook, and the Company's strength in the face of economic downturn. (Id. ¶¶ 48-53.) Although Avalara faced uncertainty about continued business with a European customer/partner ("Partner A"), Avalara's management downplayed its significance on earnings calls for Q4 2021 and Q1 2022, stating that Partner A contributed "less than 4% of revenue." (Id. ¶ 54.) And at the Analyst Day event, Avalara's management touted the Company's resilience, its desire to engage in acquisitions, and its targets for increased revenues and margins. (Id. ¶¶ 56-64.)

**B.      Avalara Considers a Sale**

       In response to interest from four private equity firms, Avalara's Board commenced a sale process in April 2022. (SAC ¶ 65.) Sohovich alleges that the private equity interest stemmed from Avalara's stock drop, which was "driven by macroeconomic trends rather than a decline in the Company's performance." (Id.) The stock drop was significant, with shares falling from $165 per share on December 31, 2020 to $71 per share on June 30, 2022. But Sohovich notes that over the same time period, Avalara maintained its high margins and "its total revenues skyrocketed 108%." (Id. ¶ 66.)

       As part of the sale process, Avalara's management prepared projections for 2022-2025, which Sohovich refers to as the "May Projections." (SAC ¶ 70.) Sohovich alleges that the May Projections were inaccurate because they project lower revenues due to challenges and risks that the Company publicly downplayed on the Q4 2021 and Q1 2022 earnings calls. (Id.) And "the Proxy statement did not reveal that the May Projections did not include any projected inorganic revenue growth from M&A activity though the Company had previously included inorganic

1    growth in its guidance, always made clear that acquisitions are a 'part of its DNA,' and would

2    continue to be a significant part of Avalara's growth story going forward.'" (Id. ¶ 71.) The Board

3    approved the projections in late May, and provided them to Avalara's financial advisor,

4    Goldman Sachs, and the interested private equity firms. (Id. ¶ 73.)

5         Of the potential acquirers, only two—Vista and "Party A"—submitted indications of

6    interest. On June 23, 2022, Vista expressed an interest in acquiring Avalara at a range between

7    $97-$101 per share, while Party A valued Avalara between $90-$95 per share. (SAC ¶ 74; Proxy

8    Statement at 39 (attached as Ex. 10 to the Declaration of Mike Rusie (Dkt. No. 46)).) According

9    to the Proxy, between July 6 and 10, Avalara's management privately provided Vista and Party

10    A with "a summary of Avalara's performance in the second quarter of 2022, which was below

11    management's expectations for revenue, representing the first quarter since Avalara's initial

12    public offering where Avalara would not beat public market analysts' expectations on revenue,

13    except for its earnings guidance released in May 2020 as a result of uncertainty around the

14    COVID-19 pandemic, and increase its revenue guidance for the year, and the effect of such

15    performance on Avalara's expected performance for the remainder of the 2022 fiscal year."

16    (Proxy at 40.) But, as Sohovich points out, the Q2 2022 revenues were $208.6 million, which fell

17    within management's public guidance of $208 to $210 million for the same quarter. (SAC ¶ 76.)

18         Avalara received no definitive proposals by the July 14th deadline it had set. (SAC ¶¶ 74-

19    75.) Party A withdrew from the sales process on July 12, 2022 because: (1) "Avalara's second

20    quarter results were below management's expectations for revenue," (2) Party A believed "that

21    Avalara's results for the remainder of the 2022 fiscal year would also be below expectations,"

22    and (3) "general macroeconomic conditions were uncertain and unfavorable." (Proxy at 41; see

23    SAC ¶ 74.) Vista did not meet the July 14th deadline, citing its need for more time to formulate a

24

bid given "Avalara's second quarter results being below management's expectations for revenue, [its] belief that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations, the deterioration in the financial markets and [its] need to contact additional financing sources and continue discussions with existing financing sources to obtain the financing that would be necessary to acquire Avalara." (Proxy at 41; SAC ¶ 74.) The Board then terminated the sales process on July 16, 2022, even though Goldman Sachs told it that several other private equity firms had expressed interest in bidding. (Id.)

On July 18, 2022, Vista contacted Goldman Sachs to express its continued interest in acquiring Avalara. (SAC ¶ 75.) That same day, Avalara's management presented, and the Board approved, a revised set of projections (the "July Projections") that lowered estimated annual revenues by 4% as compared to the May Projections. (Id.) According to the Proxy, management updated the May Projections "to take into account Avalara's performance in the second quarter of 2022 and the effect of such performance on Avalara's expected performance for the remainder of the 2022 fiscal year and the remainder of the forecast period, including a reduction in the growth of new and upsell bookings as a result of execution challenges and sales capacity issues, which reduction was expected to increase in the remainder of fiscal year 2022, high attrition in Avalara's sales and marketing departments, the expected further reduction, and likely eventual elimination, in revenue from its relationship with Partner A and additional challenges in Avalara's business." (Proxy at 42.) The Proxy describes Partner A as a large European customer that fed business to Avalara from third parties. (Proxy at 34.) Although Partner A had negotiated a lower-priced contract on the hopes of a higher volume of referrals to Avalara, the volumes did not materialize, and this hurt Avalara's international strategy and revenues. (Id.) The Proxy explained that Avalara's "management also discussed with the Board the likely need to revise

Avalara's public guidance, including a reduction in expected revenue and, by a smaller amount, an increase in non-GAAP operating income, as a result of Avalara's performance in the second quarter of 2022 and the effect of such performance of Avalara's expected performance for the remainder of the 2022 fiscal year." (Id. at 42.)

Without seeing the July Projections, Vista submitted a revised indication of interest on July 19, 2022, at $91 per share—roughly 10% below its initial indication. (SAC ¶ 78.) This was also well below Goldman Sachs' $109 per share price target it set after reviewing the Q2 results—though Sohovich fails to state when Goldman Sachs expected the stock to reach that target. (Id. ¶¶ 88, 126.) Goldman Sachs informed Vista that the indication was unlikely to receive interest from the Board. (Id. ¶ 78.) Vista told Goldman Sachs "that, while Avalara's second quarter results were below management's expectations for revenue and Vista believed that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations, Vista could potentially offer an increased price but that it would need to complete its diligence and to contact additional financing sources to obtain the financing that would be necessary to acquire Avalara, particularly given that the financial markets had continued to deteriorate." (Proxy at 42.)

On July 21, 2022, the Board met with Avalara's senior management and Goldman Sachs, and determined it would only consider a valuation between $97-$101 per share—a fact which McFarlane communicated to Vista on August 3rd. (SAC ¶ 79.) On August 4, Vista raised its offer to $92.25 per share. (Id. ¶ 80.) On August 5, the Board reviewed the offer and instructed Goldman to tell Vista that it would agree to a non-compete (or "no-shop") provision excluding other bidders if Vista raised its proposal to $95 per share. (Id. ¶ 81.) Goldman communicated this to Vista, but with a higher price of $95.75 per share. (Id. ¶ 82.) Vista rejected this proposal and

1   communicated its "best and final" offer of $93.50 per share with a "no-shop" provision. (Id.) On

2   August 7, 2022 Goldman sent Vista the July Projections and communicated its opinion that the

3   share price and valuation was fair. (Id. ¶ 84.) The Board then approved the merger agreement on

4   August 8, 2022 and publicly announced the transaction. (Id. ¶ 85.)

5           Sohovich alleges that Avalara's management and outside Directors stood to receive more

6   than $65 million from the deal and that Goldman would be paid $70 million. (SAC ¶¶ 68, 82.)

7   He also alleges that McFarlane stood to benefit by retaining his position as CEO and $30 million

8   in cash, equity, and benefits. (Id. ¶¶ 25, 68.) Sohovich also identifies two other directors who had

9   links to Vista—both were on boards of companies taken private by Vista. (Id. at ¶¶ 30, 33.) But

10  Sohovich does not argue that these two individuals stood to gain anything from Vista's

11  acquisition of Avalara.

12  **C.      Alleged Misstatements in the Proxy**

13          Although the Second Amended Complaint alleges the Proxy contained at least six

14  misstatements, Sohovich's opposition brief narrows it to just four. (SAC ¶¶ 91-120; see Pl. Opp.

15  at 11-22.)

16          First, Sohovich alleges "the Proxy falsely stated at pages 62-63 that the 'management of

17  Avalara has prepared the prospective financial information set forth below [i.e., the May and

18  July Projections] to assist in the Board's oversight of Avalara's financial and operational

19  performance in the ordinary course of business . . . in the view of Avalara's management, [the

20  May and July Projections were] prepared on a reasonable basis, reflect[] the best currently

21  available estimates and judgments, and present[], to the best of management's knowledge and

22  belief, the expected course of action and the expected future financial performance of Avalara.'"

23  (SAC ¶ 92 (quoting Proxy at 62-63).) Sohovich argues that the "statements were false and

24

1  misleading because Avalara's management did not legitimately believe that the May and July

2  Projections (i) were prepared on a reasonable basis, (ii) reflected the best currently available

3  estimates, and (iii) presented to the best of management's knowledge and belief, the expected

4  financial performance of Avalara." (SAC ¶ 93.) Sohovich identifies three specific alleged

5  falsities. First, Sohovich asserts that the May and June Projections misleadingly omitted any

6  inorganic growth even though Avalara consistently touted that M&A was "part of Avalara's

7  DNA," and that management confirmed its intent to "continu[e] to pursue value-accretive M&A

8  opportunities" after the sale to Vista. (Id. ¶¶ 93-96 (emphasis omitted).) Second, Sohovich also

9  alleges that the purported weaknesses and challenges the Proxy identifies contradicted Avalara

10 senior management's public statements downplaying those same risks and challenges. (Id. ¶¶ 93,

11 114.) Third, Sohovich alleges that the July Projections were false because they reduced revenues

12 on the false premise that the Q2 2022 results were below management's expectations when they

13 were within public guidance and that Avalara expected a reduction or elimination of revenue

14 from Partner A even though that same risk was used to justify the lower May Projections. (Id. ¶¶

15 98-101.)

16        Second, Sohovich alleges the Proxy's falsely stated that Avalara's performance for Q2

17 2022 was "below management's expectations for revenue" when the Q2 revenues actually fell

18 within management's public guidance. (SAC ¶¶ 98-100, 111-13.) As Sohovich points out, the Q2

19 2022 results were $208.6 million, which was within management's public guidance and only

20 slightly lower than the "consensus" among analysts of $209.1 million. (Id. ¶¶ 76-77.)

21        Third, Sohovich alleges the Proxy mislead shareholders by citing short-term challenges

22 and risks that "directly contradicted roughly contemporaneous statements [from] Avalara senior

23 management" downplaying those same risks. (SAC ¶ 114.) In support, Sohovich provides a chart

24

identifying the statements in the Proxy that he alleges are contradicted by statements from the Q4 2021 and Q1 2022 earnings calls and Analyst Day event. (Id.)

Fourth, Sohovich alleges that Avalara filed a Schedule 14A with the SEC that quoted only portions of a recommendation about the sale from the Institutional Shareholder Services (ISS) that ultimately misled investors to believe ISS supported the deal. (SAC ¶¶ 116-18.) As alleged, ISS's support of the deal was "cautionary", and it recommended a rejection of the golden parachute for McFarlane given the lack of alignment between his interests and other shareholders' interest. (Id.) In their Motion, Defendants note that ISS's recommendations quoted in the SAC were publicly available to investors as part of a press release filed with the SEC by Altair, a critic of the deal, before the merger vote. (Ex. 10 to the Declaration of Mike Rusie (Dkt. No. 62 at 681-85).)

**D.   Loss Causation**

Sohovich asserts that the Proxy-approved sale caused him and other Avalara shareholders an economic loss because they received less than the full, fair value for their shares of Avalara stock. (SAC ¶¶ 125-113.) First, he alleges that Defendants sold Avalara for $93.50 per share, which could not be reconciled with Goldman's price target of $109 per share that Goldman set after reviewing the Q2 2022 results approximately one month before the sale. (Id. ¶ 126.) Second, Sohovich alleges the projections improperly undervalued the company and that they misled investors into believing the deal properly valued the company. (Id. ¶¶ 127-31.) Sohovich alleges "Avalara shareholders suffered damages in the amount of the difference between the price received in the Merger and the intrinsic value of their shares as calculated in accordance with recognized methods of valuation." (Id. ¶ 131.)

1    The Court separately notes that Sohovich has alleged "transactional causation"—that the

2    Proxy was an essential link in the sale—and Defendants do not challenge these allegations. (SAC

3    ¶ 125.)

4                                             **ANALYSIS**

5    **A.      Section 14(a) Claim Elements and Motion to Dismiss Standard**

6            Section 14(a) of the Exchange Act and SEC Rule 14a–9 "disallow the solicitation of a

7    Proxy by a statement that contains either (1) a false or misleading declaration of material fact, or

8    (2) an omission of material fact that makes any portion of the statement misleading."

9    Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000); see also 15 U.S.C. § 78n(a); 17

10   C.F.R. § 240.14a–9(a). "To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish

11   that '(1) a Proxy statement contained a material misrepresentation or omission which (2) caused

12   the plaintiff injury and (3) that the Proxy solicitation itself, rather than the particular defect in the

13   solicitation materials, was an essential link in the accomplishment of the transaction.'" N.Y.C.

14   Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting Tracinda Corp. v.

15   DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007)), overruled on other grounds by Lacey v.

16   Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc)." For a statement to be false or

17   misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[ ] material

18   information.'" Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022)

19   (considering Section 10(b) claims and quoting Khoja v. Orexigen Therapeutics, Inc., 899 F.3d

20   988, 1008–09 (9th Cir. 2018)).

21           The Private Securities Litigation Reform Act (PSLRA) requires a plaintiff stating a claim

22   under Section 14(a) to: (1) "specify each statement alleged to have been misleading, the reason

23   or reasons why the statement is misleading, and, if an allegation regarding the statement or

24

omission is made on information and belief, ... all facts on which that belief is made," 15 U.S.C.

§ 78u–4(b)(1)(B); (2) "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind," id. § 78u–4(b)(2)(A); and (3) establish that "the

act or omission of the defendant alleged to violate this chapter caused the loss for which the

plaintiff seeks to recover damages," id. § 78u–4(b)(4), that is, plead "loss causation," Stoneridge

Inv. Partners v. Sci.–Atlanta, 552 U.S. 148, 165 (2008).

　　　　If alleged material misrepresentations are premised on opinion statements, the plaintiff

must identify both the objective and subjective falsity of the misrepresentations. City of

Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615 (9th

Cir. 2017). But there are "three different standards for pleading falsity of opinion statements." Id.

"First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege

both that 'the speaker did not hold the belief she professed' and that the belief is objectively

untrue." Id. (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575

U.S. 175, 185-86 (2015)). "Second, when a plaintiff relies on a theory that a statement of fact

contained within an opinion statement is materially misleading, the plaintiff must allege that 'the

supporting fact [the speaker] supplied [is] untrue.'" Id. (quoting Omnicare, 575 U.S. at 186).

"Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to

the basis for the [defendant's] opinion ... whose omission makes the opinion statement at issue

misleading to a reasonable person reading the statement fairly and in context.'" Id. (quoting

Omnicare, 575 U.S. at 194).

　　　　Additionally, in ruling on Defendants' motion under Fed. R. Civ. P. 12(b)(6), the Court

must construe the complaint in the light most favorable to the non-moving party and accept all

well-pleaded allegations of material fact as true. Livid Holdings Ltd. v. Salomon Smith Barney,

1    Inc., 416 F.3d 940, 946 (9th Cir. 2005); Wyler Summit P'ship v. Turner Broad. Sys., 135 F.3d

2    658, 661 (9th Cir. 1998). Dismissal is appropriate only where a complaint fails to allege "enough

3    facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S.

4    544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that

5    allows the court to draw the reasonable inference that the defendant is liable for the misconduct

6    alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). As the Parties agree, Sohovich need only

7    satisfy Rule 8, and not Rule 9, because he pursues only negligence-based claims. But because the

8    PSLRA applies, Sohovich must plead with particularity the facts showing the falsity of the

9    statements and the requisite state of mind. 15 U.S.C. § 78u–4(b). No scienter is required—only a

10   negligent state of mind is required. See Knollenberg v. Harmonic, Inc., 152 F. App'x 674, 682

11   (9th Cir. 2005).

12   **B.      Sohovich Fails to State a Claim under § 14(a)**

13        Sohovich has failed to allege sufficient facts to support his claim that there are four

14   material and false statements in the Proxy and other SEC materials connected to the sale. Below,

15   the Court reviews each allegedly false statement.

16        1.      **Falsity Regarding May and July Projections**

17        Sohovich claims the Proxy falsely stated that the May and July Projections were

18   "prepared on a reasonable basis, reflect[] the best currently available estimates and judgments,

19   and present[], to the best of management's knowledge and belief, the expected course of action

20   and the expected future financial performance of Avalara.'" (SAC ¶ 92.) To prove the falsity,

21   Sohovich alleges that the May and July Projections undervalued the Company by: (1) relying on

22   short-term challenges and risks that Avalara executives had consistently downplayed; and (2)

23   excluding inorganic growth from future revenue projections, despite the executive drumbeat that

24

M&A was in Avalara's DNA. And Sohovich argues the July Projections additionally reflect misleading and false statements that: (1) Avalara's Q2 2022 results were below management's expectations; and (2) the loss of revenues from Partner A justified a lower July Projections. Before the Court examines the merits of these arguments, the Court briefly reviews its previous analysis of whether these statements are actionable under the PSLRA safe harbor.

### a.   PSLARA Safe Harbor

As the Court's prior Order explained, only some portions of these alleged misstatements fall outside of the PSLRA's safe harbor for forward-looking statements. (MTD Order at 12-15.) Although the Parties do not argue this issue, the Court reviews it to orient its analysis and conclusions below.

"The PSLRA's safe harbor provision exempts, under certain circumstances, a forward-looking statement, which is any statement regarding (1) financial projections, (2) plans and objectives of management for future operations, (3) future economic performance, or (4) the assumptions underlying or related to any of these issues." Police Ret. Sys. of St. Louis v. Intuitive Surgical, Inc., 759 F.3d 1051, 1058 (9th Cir. 2014) (citation and quotation omitted). A forward-looking statement falls within the safe harbor when it is "(i) identified as a forward-looking statement, and is accompanied by meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement," or (ii) if it is not identified as a forward-looking statement and not accompanied by cautionary language, "made with actual knowledge . . . that the statement was false or misleading." 15 U.S.C. § 78u–5(c)(1); see Intuitive Surgical, 759 F.3d at 1058; In re Quality Sys., Inc. Sec. Litig., 865 F.3d 1130, 1141 (9th Cir. 2017).

But statements which mix forward-looking with non-forward-looking statements about "past or current" facts cause the non-forward looking statement to fall outside of the safe harbor.

1   See In re Quality Sys., 865 F.3d at 1141. "[A] defendant may not transform non-forward-looking

2   statements into forward-looking statements that are protected by the safe harbor provisions of the

3   PSLRA by combining non-forward-looking statements about past or current facts with forward-

4   looking statements about projected revenues and earnings." Id. In a mixed statement, the

5   forward-looking portion will fall within the safe harbor only if, "examined as a whole, the

6   challenged statements relate[ ] to future expectations and performance." Intuitive Surgical, 759

7   F.3d at 1059 (citing In re Cutera Sec. Litig., 610 F.3d 1103, 1111 (9th Cir. 2010)).

8          The Court previously found three portions of the first statement to be actionable, non-

9   forward looking statements that fall outside of the PSLRA's safe harbor. (MTD Order at 13-14.)

10         The first non-forward-looking component is that the May and July Projections were

11  "prepared on a reasonable basis." The basis on which the Projections were prepared include

12  management's then-current knowledge about Avalara's existing strengths and weakness, as well

13  as its current and planned strategies. If, as Sohovich alleges, the May and July Projections

14  improperly omitted any future revenue from Avalara's existing M&A strategy or

15  mischaracterized the Q2 revenues, then the statement misrepresented an existing fact and is not

16  forward looking.

17         The second non-forward-looking component of the statement is that the May and July

18  Projections "reflect the best currently available estimates and judgments." This is not a forward-

19  looking statement because it speaks to management's then-existing estimates and judgments,

20  which could be misleading if they are shown to be false. For example, if Sohovich can prove that

21  management planned to continue its M&A activity and wrongly ascribed no future revenue to

22  such activity, it could prove the statement false. This statement is separate from the projections

23  themselves, and remains actionable. See Baum v. Harman Int'l Indus., Inc., 408 F. Supp. 3d 70,

24

1   83 (D. Conn. 2019) (noting that the safe harbor does not apply to the "failure to disclose the fact

2   that the Management Projections did not account for acquisitions, if that fact were material").

3          The third non-forward-looking component of the statement is that the May and July

4   Projections show "to the best of management's knowledge and belief, the expected course of

5   action and the expected future financial performance of Avalara." To the extent this identifies

6   management's existing knowledge and belief, the statement is actionable and not forward

7   looking. For example, the statement could be shown to be untrue if management did, in fact, plan

8   to engage in M&A and wrongly omitted revenues from it. But to the extent the statement refers

9   to beliefs about future performance, it falls within the safe harbor as a forward looking statement

10  for which there are adequate risk disclosures. (See Proxy at 62-65; see, e.g., id. at 62 ("this

11  information is not fact and should not be relied upon as being necessarily indicative of future

12  results, and readers of this proxy are cautioned not to place undue reliance on the prospective

13  financial information.").)

14                          **b.      Weaknesses and Challenges**

15         Sohovich alleges the May and July Projections do not accurately reflect management's

16  knowledge and belief about Avalara's current condition because they rely on short-term

17  weaknesses and risks that Avalara's management had consistently downplayed. Sohovich

18  acknowledges the Court previously held that only those statements which contain numeric

19  specificity can serve as the basis for proving falsity—general optimism about risks and

20  weaknesses amount to inactionable puffery. (See MTD Order at 15 (citing Gammel v. Hewlett-

21  Packard Co., 905 F. Supp. 2d 1052, 1070 (C.D. Cal. 2012)).) While Sohovich tries to find

22  numerically-specific prior statements, his efforts fall far short. In this section, the Court reviews

23  the six prior statements about risks and weaknesses Sohovich claims are numerically specific and

24  which show falsity.

1    First, Sohovich argues that the Proxy cited "slower than expected growth in both new

2  bookings and upsell bookings" for Q1 2022, which he claims contradicts "the 1Q22 earnings call

3  and Analyst Day [events where] management stated that Avalara did not need new bookings in

4  1Q22." (Pl. Opp. at 13.) Nothing in Plaintiff's brief or the SAC shows that Avalara's

5  management made any such specific statements. The SAC's quotations from investor calls

6  contain management's statements that Avalara had seen good growth in upselling (i.e., selling to

7  existing customers), including a 116% net revenue retention over the past year and 25% year-

8  over-year growth in upselling over the past year. (SAC ¶ 114.) But management did not cite

9  these figures to claim that the company would not need any new bookings. At most, the SAC

10  cites to puffery about the "healthy expansion" of upsells and the "really good momentum" the

11  company had with selling to existing customers. (SAC ¶ 114.) These are not numerically-specific

12  statements that would support a claim of falsity, and there are no allegations to support

13  Sohovich's gloss that management somehow stated, "Avalara did not need new bookings." (Opp.

14  at 13.) The Court rejects this argument as a basis for finding falsity.

15    Second, Sohovich argues that the Proxy misled investors to believe that the Q2 2022

16  results were below management's expectations when they fell within management's prior

17  guidance. The Court previously found that this statement in the Proxy is not false because there

18  is a distinction between public guidance and management's expectations. (MTD Order at 18.)

19  While the Court explores this issue in more detail in Section (B)(1)(d) below, the Court notes

20  here that Sohovich offers no new allegations that might alter the Court's earlier conclusion. The

21  Court rejects this argument as a basis for finding falsity.

22    Third, Sohovich argues the Proxy cited the decline in revenue from Partner A as a reason

23  for lowered projections, which allegedly contradicted prior statements that losing Partner A was

24

"not that huge of an issue" because Avalara was "not dependent on [Partner A]," who accounted for "less than 4% of our total revenue," and because Avalara had "over 1,200 signed partners" in a large "addressable" market. (Pl. Opp. at 13; SAC ¶ 114.) While Sohovich is correct that Avalara's management downplayed the loss of Partner A, he fails to cite any numerically-specific statement that the loss of Partner A would not adversely impact the Company or its revenue projections. There are no statements cited that Avalara had identified any specific sources of revenue that might offset the lost revenue that Partner A generated ($27 million in revenue in 2021). There is no basis to find that the loss of revenue should not have been cited as a reason to lower the projections. In sum, the Court finds no allegations that might show the objective falsity of reducing revenue projections based on the loss of Partner A. The Court rejects this argument as a basis for finding falsity.

Fourth, Sohovich argues the Proxy cited to macroeconomic risk to justify the lower projections, but "Avalara management previously assured investors that it is 'proven' that macroeconomic conditions do not impact Avalara because 'our customers must always calculate taxes and file returns[.]'" (Pl. Opp. at 13.) And Sohovich argues that Avalara "quantified" this fact by citing the breakdown of how revenues came from tax calculations, returns, and compliance products. (Id.) But the breakdown Sohovich provides does not show a numerically-specific figure that would make the statement about macroeconomic risks false. Avalara certainly told investors it was well positioned to face macroeconomic downturn, but the Court finds no prior statements suggesting that it would face no impact from such a downturn. The Court rejects this argument as a basis for finding falsity.

Fifth, Sohovich argues that Proxy misled investors to believe Avalara faced risk from a reduction in regulatory compliance, when McFarlane "previously promised that by 2025 '80% of

organizations will be forced either by legislation or important trading partners to exchange invoiced in electronic format'" and that compliance would increase. (Pl. Opp. at 13-14.) While Sohovich has identified a numeric figure—80%—the actual statements were not promises and refer only to expectations. Because the prior statements are not guarantees or promises, the Court reject this argument as a basis for finding falsity.

Sixth, Sohovich argues the revenue projections falsely omitted "inorganic" growth from M&A, which contradicted Avalara's consistent use of M&A as part of revenue projections. For the reasons the Court explores in Section (B)(1)(c), below, this allegation is inadequate to show falsity.

### c.    Omission of M&A from the Projections

Sohovich separately alleges that the May and July Projections were themselves false and misleading because they did not include M&A revenues to forecast future revenues. These allegations fail to show objective falsity.

First, although Sohovich has now alleged that the May and July Projections omitted revenues from future acquisitions, he has no not provided any reason why the omission of revenues would be false or misleading. As the Proxy discloses, there were no acquisitions in the near or long-term horizon, and the hopes of acquiring Company A had disappeared by late June before the sale in August. The Proxy explicitly stated that when management presented the July Projections, they "reviewed with the Board recent challenges and opportunities in Avalara's strategic plan, the potential effects on the Company's market value as a result of continuing to execute on the Company's strategic plan, potential strategic acquisitions and the status of the potential sale process." (Proxy at 40.) This undermines Sohovich's allegation because there do not appear to have been any potential acquisitions that might have been used to generate future projections.

Sohovich also fails to allege any facts that show how Avalara deviated from any prior practice of setting long-term projections that included revenues or targets for M&A. At best, he alleges that Avalara traditionally provided quarterly guidance that included both organic and inorganic growth, (SAC ¶ 95), and that the CFO told investors on the Q1 2022 earnings call that Avalara would not "break out total and organic revenue anymore because the 2021 acquisitions were small, and it creates an insignificant delta." (Dkt. No. 62 at 583.) But these statements refer to quarterly guidance, not long-term projections. Nor do they establish the point Sohovich needs to make—that Avalara consistently created long-term projections that factored M&A revenues such that investors would be misled by the May and July Projections' omission of such revenues. And, as with the First Amended Complaint, Sohovich's Second Amended Complaint identifies no legal or accounting principal that would have required Avalara to project revenues from future, hypothetical acquisitions. The omission of revenues from the Projections for hypothetical future acquisitions does not appear false or misleading even if Avalara maintained a strategy to engage in future M&A.

The facts here fall far afield from the allegations found adequate to state a Section 14(a) claim in NECA-IBEW Pension Tr. Fund v. Precision Castparts Corp., No. 3:16-cv-01756, 2017 WL 4453561 (D. Or. Oct. 3, 2017), report and recommendation adopted, No. 3:16-cv-01756, 2018 WL 533912 (D. Or. Jan. 24, 2018). There, the company's projections used in the proxy omitted revenue from M&A despite: (1) acquisitions being the company's "primary objective"; (2) previously disclosing dollar-figure targets for acquisitions and previously preparing projections with future M&A revenues; and (3) acquiring two companies just days after preparing the projections that omitted any M&A revenues. Id. at *2-3, *7-8. Here, Sohovich identifies no similar facts that might make NECA persuasive on this issue. This case is also

distinguishable from <u>Azar v. Blount Int'l, Inc.</u>, where the court found the proxy contained a materially misleading omission of revenue projections that more accurately reflected the company's public statements about positive quarterly revenues and instead relied on pessimistic projections developed management developed to justify the sale. <u>Id.</u>, No. 3:16-CV-483-SI, 2017 WL 1055966, at *5 (D. Or. Mar. 20, 2017). Here, there are no colorable allegations that Avalara's management failed to disclose the existence of earlier, rosier projections.

The Court finds the amended allegations insufficient to support the objective falsity of the Projections.

### d.   Management Expectations for Q2 2022 Revenues

Sohovich again alleges that the Proxy misled investors to believe that the Q2 2022 results were below management's expectations, when they were actually within the public guidance. (<u>See</u> SAC ¶ 111.) Sohovich identifies no new allegations that would support his conclusion that "management's expectations" are interchangeable with management's public "guidance." For the same reasons the Court explained it its prior Order, which it adopts herein, the Court finds these allegations inadequate. (<u>See</u> MTD Order at 18.)

The Court also reviews and rejects two new arguments Sohovich makes. First, Sohovich argues that the reasonable inference that one should draw in his favor from the Proxy is that the term "guidance" and "expectations" are interchangeable because the Proxy never specifically identifies management's expectations about Q2 revenues. But the omission of the specific dollar figure for management's expectations does not show falsity or that the two terms are interchangeable. Nor is the Court persuaded by Sohovich's argument that because management used the word "expect" or "expectation" in investor calls to explicitly discuss public "guidance," the terms are interchangeable. The full context of the calls shows that they were explicitly discussing public guidance and not internal management expectations.

1  Second, Sohovich argues that management's expectations must be the same as the public

2  guidance because the Proxy does not label them as "internal." But context matters. It makes little

3  sense that the Proxy would label management's expectations as "internal" when the Proxy itself

4  describes behind-the-scenes machinations related to a potential sale. Indeed, Avalara's

5  management believed that given the weakening revenues, it would need to revise its public

6  guidance for the remainder of fiscal year 2022. (Proxy at 42.) This helps underscore the

7  distinction between internal expectations and public guidance. Public statements set investor

8  expectations and can expose a company to liability, while internal metrics are private and not

9  intended to guide public expectations. Sohovich does not identify any reason to ignore this

10  difference, which makes his requested inference implausible or unreasonable. Nor does it make

11  any difference that the Proxy ultimately disclosed the discussions and projections to the public.

12  At the time they were made, the statements about management's expectations were private. The

13  Court finds these amended allegations insufficient to support the objective falsity of the

14  statements about management expectations.

15  **e.    Partner A**

16  Sohovich newly alleges that the loss of Partner A should not have been factored into the

17  July Projections because management already expected the loss of revenue from Partner A when

18  they crafted the May Projections. (Pl. Opp. at 16; SAC ¶ 101.) This argument lacks merit when

19  considering the Proxy's disclosure as to how the relationship with Partner A deteriorated after

20  the May Projections were created. The Proxy states that when the May Projections were created,

21  management as a "challenge[] . . . affecting Avalara's business and operations, . . . the reduction

22  in revenue attributable to Partner A due to lower volumes and an expected decrease in contract

23  pricing, which was expected to be reduced further, and, in light of the lower associated profit

24  margins, members of Avalara's senior management were contemplating potentially winding

1  down Avalara's relationship with Partner A." (Proxy at 35.) Stated differently, while there were

2  some reductions in revenues, the relationship was evolving (or devolving) when the May

3  Projections were drafted. On July 18, 2022, management presented the July Projections, which

4  "take into account" among other things, "the expected further reduction, and likely eventual

5  elimination, in revenue from its relationship with Partner A," which would "likely" require a

6  "need to revise Avalara's public guidance" for expected revenues in the remainder of 2022.

7  (Proxy at 41-42.) As this makes clear, the relationship with Partner A deteriorated over time such

8  that Avalara would actually have to revise its public revenue guidance for the rest of the year.

9  Sohovich has failed to show that the revenues from Partner A were static between the May and

10  July Projections such that a reduction in forecast revenues in July were false or misleading. The

11  Court rejects this argument and continue to find an absence of objective falsity.

12          2.      **Statements re Q2 2022 Results**

13          Sohovich again alleges that the Proxy misled investors to believe that the Q2 2022 results

14  were below management's expectations, when they were actually within the public guidance.

15  (See SAC ¶ 111.) The Court finds that Sohovich has not sufficiently alleged how these

16  statements are objectively false, for the reasons set forth above in Sections (B)(1)(b) and

17  (B)(1)(d).

18          3.      **Proxy's Disclosure of Risks and Challenges**

19          Sohovich alleges that the Proxy misled investors to believe that the weaknesses and risks

20  were valid reasons to accept the offer price. (See SAC ¶ 114.) But as explained in Section

21  (B)(1)(b), above, the Court finds that Sohovich has not sufficiently alleged how these statements

22  are actionable and objectively false.

23

24

1        4.    **Proxy's Statements Regarding the ISS Recommendation**

2    Sohovich newly argues that Defendants filed a Schedule 14A with the SEC that misled

3    people to believe that the Institutional Shareholder Services (ISS) supported the merger when it

4    qualified its support as "cautionary" and recommend against approval of McFarlane's golden

5    parachute. (SAC ¶¶ 116-118.) But as Sohovich admits, the relevant portions of the ISS report

6    that he claims Defendants omitted were publicly filed with a major investor's objections to the

7    deal. (Pl. Opp. at 21 n.10.) This was the "Altair" report, which provided substantial criticism of

8    the deal. And while Avalara did not file the clarifying information, it was available in the total

9    mix of information that is relevant to understanding whether the deal was favorable or fair. See,

10   e.g., United Paperworks Int'l Union v. Int'l Paper Co., 985 F.2d 1190, 1192 (2d Cir. 1993). The

11   Court finds that Sohovich has not provided sufficient allegations to support the theory that the

12   omission of the full ISS report was misleading, false, or material to investors given the total mix

13   of information available.

14       5.    **Abandoned Allegations**

15   The Court briefly reviews two allegedly false and misleading statements in the SAC that

16   Sohovich has failed to adequately defend.

17   First, the SAC includes allegations that the Proxy included an investor presentation that

18   also contains false and misleading statements. (SAC ¶ 115.) Defendants move for dismissal,

19   providing substantial arguments as to why this allegation fails to plead falsity. In his opposition,

20   Sohovich drops a footnote suggesting that the investor presentation "regurgitates many of the

21   same misstatements contained in the Proxy" and the "falsity of the presentation is thus

22   adequately pled[.]" (Pl Opp. at 21 n.9.) This conclusory argument lacks any explanation of what

23   the false statements are or how they differ from the other statements on which the Parties have

24

1    provided substantial argument. Sohovich's brief falls well short of defending the allegations. The

2    Court finds Defendants' Motion on this issue persuasive and dismisses the claims related to this

3    presentation.

4           Second, the SAC alleges that the Proxy misled investors to believe the deal price was a

5    premium. (SAC ¶¶ 119-20.) Defendants move to dismiss the claim, pointing out that the Proxy

6    correctly noted the stock price and that the statement is not false. Sohovich makes no opposition

7    to this argument, and the Court dismisses the claims premised on these allegations.

8    **C.      Subjective Falsity and Mental State of Individual Defendants**

9           Because Sohovich has not adequately pleaded objective falsity, the Court need not

10   consider whether he has also alleged the subjective falsity of the statements and the requisite

11   mental state as to each defendant. But for the sake of completeness, the Court briefly reviews

12   these two issues and again finds the allegations adequate only as to McFarlane, the CEO.

13          The Court previously found that the amended complaint's allegations were inadequate to

14   show that any of the directors other than McFarlane had any knowledge of the allegedly false

15   statements. (MTD Order at 19.) The SAC newly alleges that McFarlane presented information to

16   the Board about the May and July Projections over nine separate meetings, from which the board

17   members would have known the projections omitted inorganic growth and reflected risks and

18   weaknesses that contradicted public statements. While these allegations are plausible, they are

19   not particularized such that each defendant is identified as having sufficient personal knowledge

20   of each allegedly false statement in the Proxy. The Court finds these allegations inadequate to

21   support subjective falsity as to the board members other than McFarlane.

22

23

24

1    As to McFarlane, the Court finds the allegations are again sufficient to satisfy the

2    showing of objective falsity and the requisite mental state. The Court adopts the reasoning of its

3    prior Order on this issue. (MTD Order at 18, 20.)

4    **D.    Materiality**

5    Given the Court's conclusions about the inadequacies of objective falsity, the Court

6    declines to separately examine the allegations as to materiality, except as explained with regard

7    to the ISS report, above. The Court otherwise adopts its prior Order's conclusions regarding

8    materiality. (See MTD Order at 19.) This does not, however, alter the Court's order of dismissal.

9    **E.    Loss Causation**

10   Because Sohovich has not adequately alleged any misstatements in violation of Section

11   14(a) or 20(a), the Court declines to reach the question of loss causation.

12   **F.    Section § 20(a) Claims**

13   Because Sohovich has not adequately alleged any viable claims under Section 14(a) of

14   the Exchange Act, the Court similarly finds dismissal of the dependent Section 20(a) claims.

15                                 **CONCLUSION**

16   Despite being given an opportunity to add further allegations to support his Section 14(a)

17   and 20(a) claims, Sohovich continues not to identify sufficient factual allegations to sustain his

18   claims. The minimal additions included in the SAC fail to plead adequate Exchange Act claims.

19   The Court therefore GRANTS the Motion to Dismiss the SAC. And because the Court has

20   already granted leave to amend and the Court believes that further amendment would be futile,

21   the Court DISMISSES the claims WITH PREJUDICE. The Court also notes that Sohovich has

22   not requested leave to amend in his Opposition, which further supports dismissal with prejudice.

23   \\

24

ORDER GRANTING SECOND MOTION TO DISMISS - 25

The clerk is ordered to provide copies of this order to all counsel.

Dated March 1, 2024.

Marsha J. Pechman
United States Senior District Judge