UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| MARTIN SOHOVICH, | CASE NO. C22-1580 MJP |
| Plaintiff, | ORDER DENYING IN PART DEFENDANTS' RENEWED MOTION TO DISMISS |
| v. | |
| AVALARA, INC., et al., | |
| Defendants. | |

This matter comes before the Court on Defendants' Supplemental Brief Upon Remand from the Ninth Circuit, in which Defendants ask the Court to again dismiss Plaintiff Martin Sohovich's Second Amended Complaint. (Dkt. No. 75 (the "Renewed Motion to Dismiss").) Having reviewed the Renewed Motion to Dismiss, Plaintiff's Response (Dkt. No. 77), the Reply (Dkt. No. 87), and all supporting materials, the Court DENIES Defendants' Motion in part.

**BACKGROUND**

Martin Sohovich, an investor in Avalara, Inc., alleges that Defendants Avalara and its Board of Directors (which includes Avalara's CEO) misled investors as to the fairness of

1 Avalara's $8.4 billion sale in August 2022 to a private investor—Vista Equity Partners
2 Management, LLC. Sohovich alleges the Proxy distributed to the investors to vote on the sale to
3 Vista contained misleading and false statements that misrepresented the fair value of Avalara and
4 violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act).

The Court previously granted dismissal of Sohovich's Amended Complaint's (Dkt. No. 37 ("AC")), and Second Amended Complaint ("SAC" (Dkt. No. 57)). (See Orders of Dismissal (Dkt. Nos. 54, 66).) Sohovich appealed the dismissal of the SAC, and the Ninth Circuit affirmed in part and reversed in part, vacating the dismissal. (Dkt. No. 71.) The Ninth Circuit remanded with instructions for the Court to assess several arguments raised in Defendants' Motion to Dismiss concerning two alleged misstatements in the SAC. (Id. at 10.) The Court has authorized renewed briefing in light of the Ninth Circuit's Memorandum, and construes the matter pending before it a renewal of Defendants' Motion to Dismiss the SAC. To orient the reader, the Court reviews the relevant allegations SAC's allegations about Avalara, the Proxy, and the sale.

**A.    Avalara's business**

"Avalara is a leading provider of cloud-based tax compliance software that automates the routine transactional tax work traditionally performed by a company's tax or legal department." (SAC ¶ 2.) A successful business, Avalara has grown substantially, particularly from 2015 through 2021 where its total annual revenues grew at a compound annual growth rate of 33.6%. (Id. ¶ 43.) Avalara has grown by increasing its customer base and by acquiring other companies. From Q1 2018 through Q2 2022, Avalara added an average of 750 customers per quarter. (Id. ¶ 45.) And through its acquisition strategy, Avalara acquired twenty-eight companies from 2007 to 2021, including twelve between 2018 to 2021. (Id. ¶ 46.) Avalara's management, included

1  Defendant Scott McFarlane, the CEO and Board Chair, often told investors that "M&A is part of
2  Avalara's DNA." (Id. ¶ 48)
3  　　　Leading up to its August 2022 sale, Sohovich alleges that Avalara's management
4  maintained a positive outlook and touted the Company's strong sales, competitive advantages,
5  acquisition strategy, and low volatility even in the face of a cooling economy. (SAC ¶¶ 48-53.)
6  Sohovich supports these allegations with statements Avalara's management made on earnings
7  calls for Q4 2021 and Q1 2022 (February and May 2022, respectively) and at an "Analyst Day"
8  event in late June 2022. (Id. ¶ 4.) During the earnings calls, Avalara's management described its
9  ongoing acquisition strategy, its belief in the Company's strong long-term business outlook, and
10 the Company's strength in the face of economic downturn. (Id. ¶¶ 48-53.) Although Avalara
11 faced uncertainty about continued business with a European customer/partner ("Partner A"),
12 Avalara's management downplayed its significance on earnings calls for Q4 2021 and Q1 2022,
13 stating that Partner A contributed "less than 4% of revenue." (Id. ¶ 54.) And at the Analyst Day
14 event, Avalara's management touted the Company's resilience, its desire to engage in
15 acquisitions, and its targets for increased revenues and margins. (Id. ¶¶ 56-64.)

16 **B.    Avalara Considers a Sale**
17 　　　In response to interest from four private equity firms, Avalara's Board commenced a sale
18 process in April 2022. (SAC ¶ 65.) Sohovich alleges that the private equity interest stemmed
19 from Avalara's stock drop, which was "driven by macroeconomic trends rather than a decline in
20 the Company's performance." (Id.) The stock drop was significant, with shares falling from $165
21 per share on December 31, 2020 to $71 per share on June 30, 2022. But Sohovich notes that over
22 the same time period, Avalara maintained its high margins and "its total revenues skyrocketed
23 108%." (Id. ¶ 66.)
24

1          As part of the sale process, Avalara's management prepared projections for 2022-2025,
2   which Sohovich refers to as the "May Projections." (SAC ¶ 70.) Sohovich alleges that the May
3   Projections were inaccurate because they project lower revenues due to challenges and risks that
4   the Company publicly downplayed on the Q4 2021 and Q1 2022 earnings calls. (Id.) And "the
5   Proxy statement did not reveal that the May Projections did not include any projected inorganic
6   revenue growth from M&A activity though the Company had previously included inorganic
7   growth in its guidance, always made clear that acquisitions are a 'part of its DNA,' and would
8   continue to be a significant part of Avalara's growth story going forward.'" (Id. ¶ 71.) The Board
9   approved the projections in late May, and provided them to Avalara's financial advisor,
10  Goldman Sachs, and the interested private equity firms. (Id. ¶ 73.)
11         Of the potential acquirers, only two—Vista and "Party A" (Thoma Bravo)—submitted
12  indications of interest. On June 23, 2022, Vista expressed an interest in acquiring Avalara at a
13  range between $97-$101 per share, while Thoma Bravo valued Avalara between $90-$95 per
14  share. (SAC ¶ 74; Proxy Statement at 39 (attached as Ex. 10 to the Declaration of Mike Rusie
15  (Dkt. No. 46)).) According to the Proxy, between July 6 and 10, Avalara's management privately
16  provided Vista and Thoma Bravo with "a summary of Avalara's performance in the second
17  quarter of 2022, which was below management's expectations for revenue, representing the first
18  quarter since Avalara's initial public offering where Avalara would not beat public market
19  analysts' expectations on revenue, except for its earnings guidance released in May 2020 as a
20  result of uncertainty around the COVID-19 pandemic, and increase its revenue guidance for the
21  year, and the effect of such performance on Avalara's expected performance for the remainder of
22  the 2022 fiscal year." (Proxy at 40.) But, as Sohovich points out, the Q2 2022 revenues were
23
24

$208.6 million, which fell within management's public guidance of $208 to $210 million for the same quarter. (SAC ¶ 76.)

Avalara received no definitive proposals by the July 14th deadline it had set. (SAC ¶¶ 74-75.) Thoma Bravo withdrew from the sales process on July 12, 2022 because: (1) "Avalara's second quarter results were below management's expectations for revenue," (2) Thoma Bravo believed "that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations," and (3) "general macroeconomic conditions were uncertain and unfavorable." (Proxy at 41; see SAC ¶ 74.) Vista did not meet the July 14th deadline, citing its need for more time to formulate a bid given "Avalara's second quarter results being below management's expectations for revenue, [its] belief that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations, the deterioration in the financial markets and [its] need to contact additional financing sources and continue discussions with existing financing sources to obtain the financing that would be necessary to acquire Avalara." (Proxy at 41; SAC ¶ 74.) The Board then terminated the sales process on July 16, 2022, even though Goldman Sachs told it that several other private equity firms had expressed interest in bidding. (Id.)

On July 18, 2022, Vista contacted Goldman Sachs to express its continued interest in acquiring Avalara. (SAC ¶ 75.) That same day, Avalara's management presented, and the Board approved, a revised set of projections (the "July Projections") that lowered estimated annual revenues by 4% as compared to the May Projections. (Id.) According to the Proxy, management updated the May Projections "to take into account Avalara's performance in the second quarter of 2022 and the effect of such performance on Avalara's expected performance for the remainder of the 2022 fiscal year and the remainder of the forecast period, including a reduction in the growth of new and upsell bookings as a result of execution challenges and sales capacity issues,

which reduction was expected to increase in the remainder of fiscal year 2022, high attrition in Avalara's sales and marketing departments, the expected further reduction, and likely eventual elimination, in revenue from its relationship with Partner A and additional challenges in Avalara's business." (Proxy at 42.) The Proxy describes Partner A as a large European customer that fed business to Avalara from third parties. (Proxy at 34.) Although Partner A had negotiated a lower-priced contract on the hopes of a higher volume of referrals to Avalara, the volumes did not materialize, and this hurt Avalara's international strategy and revenues. (Id.) The Proxy explained that Avalara's "management also discussed with the Board the likely need to revise Avalara's public guidance, including a reduction in expected revenue and, by a smaller amount, an increase in non-GAAP operating income, as a result of Avalara's performance in the second quarter of 2022 and the effect of such performance of Avalara's expected performance for the remainder of the 2022 fiscal year." (Id. at 42.)

      Without seeing the July Projections, Vista submitted a revised indication of interest on July 19, 2022, at $91 per share—roughly 10% below its initial indication. (SAC ¶ 78.) This was also well below Goldman Sachs' $109 per share price target it set after reviewing the Q2 results—though Sohovich fails to state when Goldman Sachs expected the stock to reach that target. (Id. ¶¶ 88, 126.) Goldman Sachs informed Vista that the indication was unlikely to receive interest from the Board. (Id. ¶ 78.) Vista told Goldman Sachs "that, while Avalara's second quarter results were below management's expectations for revenue and Vista believed that Avalara's results for the remainder of the 2022 fiscal year would also be below expectations, Vista could potentially offer an increased price but that it would need to complete its diligence and to contact additional financing sources to obtain the financing that would be necessary to

acquire Avalara, particularly given that the financial markets had continued to deteriorate." (Proxy at 42.)

On July 21, 2022, the Board met with Avalara's senior management and Goldman Sachs, and determined it would only consider a valuation between $97-$101 per share—a fact which McFarlane communicated to Vista on August 3rd. (SAC ¶ 79.) On August 4, Vista raised its offer to $92.25 per share. (Id. ¶ 80.) On August 5, the Board reviewed the offer and instructed Goldman to tell Vista that it would agree to a non-compete (or "no-shop") provision excluding other bidders if Vista raised its proposal to $95 per share. (Id. ¶ 81.) Goldman communicated this to Vista, but with a higher price of $95.75 per share. (Id. ¶ 82.) Vista rejected this proposal and communicated its "best and final" offer of $93.50 per share with a "no-shop" provision. (Id.) On August 7, 2022 Goldman sent Vista the July Projections and communicated its opinion that the share price and valuation was fair. (Id. ¶ 84.) The Board then approved the merger agreement on August 8, 2022 and publicly announced the transaction. (Id. ¶ 85.)

Sohovich alleges that Avalara's management and outside Directors stood to receive more than $65 million from the deal and that Goldman would be paid $70 million. (SAC ¶¶ 68, 82.) He also alleges that McFarlane stood to benefit by retaining his position as CEO and $30 million in cash, equity, and benefits. (Id. ¶¶ 25, 68.) Sohovich also identifies two other directors who had links to Vista—both were on boards of companies taken private by Vista. (Id. at ¶¶ 30, 33.) But Sohovich does not argue that these two individuals stood to gain anything from Vista's acquisition of Avalara.

C.      **Alleged Misstatements in the Proxy**

The Ninth Circuit has narrowed the actionable misstatements and omissions from the SAC to just two: (1) Avalara misled investors by omitting information that the May and July

Projections did include inorganic growth as part of the valuation; and (2) Avalara misled investors by cherry-picking positive information from a report issued by the Institutional Shareholder Services (ISS) about the deal, while omitting negative information. The Court reviews both sets of allegations.

First, Sohovich alleges "the Proxy falsely stated at pages 62-63 that the 'management of Avalara has prepared the prospective financial information set forth below [i.e., the May and July Projections] to assist in the Board's oversight of Avalara's financial and operational performance in the ordinary course of business . . . in the view of Avalara's management, [the May and July Projections were] prepared on a reasonable basis, reflect[] the best currently available estimates and judgments, and present[], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Avalara.'"(SAC ¶ 92 (quoting Proxy at 62-63).) Sohovich argues that the "statements were false and misleading because Avalara's management did not legitimately believe that the May and July Projections (i) were prepared on a reasonable basis, (ii) reflected the best currently available estimates, and (iii) presented to the best of management's knowledge and belief, the expected financial performance of Avalara. (SAC ¶ 93.) Specifically, Sohovich asserts that the May and June Projections misleadingly omitted any inorganic growth even though Avalara consistently touted that M&A was "part of Avalara's DNA," and that management confirmed its intent to "continu[e] to pursue value-accretive M&A opportunities" after the sale to Vista. (Id. ¶¶ 93-96 (emphasis omitted).) The Ninth Circuit agreed, noting that the "omission—and the lack of notice about such omission—could materially mislead a reasonable investor" given how central M&A had been to Avalara's growth and its "DNA." (Ninth Cir. Mem. at 8.)

1    Second, Sohovich contends that Avalara's misled investors to believe ISS supported the deal by cherry-picking positive information from it, while omitting its criticism. (SAC ¶¶ 116-18.) As alleged, ISS's support of the deal was "cautionary", and it recommended a rejection of the golden parachute for McFarlane given the lack of alignment between his interests and other shareholders' interest. (SAC ¶¶ 116-18.) The Ninth Circuit held that Sohovich had provided adequate particularized allegations, which when "credited as true, 'create an impression of a state of affairs that differs in a material way from the one that actually exists,' i.e., that ISS's recommendation was not as approbatory as Avalara touted." (Ninth Cir. Mem. at 6 (quoting In re Facebook, Inc., 87 F.4th 934, 948 (9th Cir. 2023)).) The Ninth Circuit also rejected Defendants' argument the statements about the ISS report are inactionable because some of the unfavorable portions of the ISS report where filed by Altair, a critic of the deal. (Id. at 7.)

**D.    Loss Causation**

Sohovich asserts that the Proxy-approved sale caused him and other Avalara shareholders an economic loss because they received less than the full, fair value for their shares of Avalara stock. (SAC ¶¶ 125-113.) First, he alleges that Defendants sold Avalara for $93.50 per share, which could not be reconciled with Goldman's price target of $109 per share, which it set after reviewing the Q2 2022 results approximately one month before the sale. (Id. ¶ 126.) Second, Sohovich alleges the projections improperly undervalued the company and that they misled investors into believing the deal properly valued the company. (Id. ¶¶ 127-31.) Sohovich alleges "Avalara shareholders suffered damages in the amount of the difference between the price received in the Merger and the intrinsic value of their shares as calculated in accordance with recognized methods of valuation." (Id. ¶ 131.) He also alleges that Avalara stock closed at $95.55 a share on the day before Avalara announced the sale to Avalara. (¶¶ 87, 132.) This,

Sohovich argues, shows that Avalara was really worth more than what Avalara led investors to believe through the Proxy, which proposed a sale at $93.50.

The Court notes that Defendants do not challenge Sohovich's allegations that the Proxy was an essential link in the sale of the company to Vista, in satisfaction of "transactional causation." (SAC ¶ 125.)

**E.    Scope of Remand**

In its Memorandum, the Ninth Circuit remanded this matter with the following instructions: "the district court, on REMAND, should address, as to Avalara's statement about ISS's report and the Projections' omission of inorganic growth: (1) subjective falsity and negligence, except for CEO McFarlane; (2) materiality, to the extent the district court found them immaterial; and (3) loss causation." (Ninth Cir. Mem. at 10.) "Afterward, the district court should consider whether Sohovich's claim amounts to a viable section 14(a) or Rule 14a-9 violation so as to trigger section 20(a) liability." (Id.)

## ANALYSIS

**A.    Section 14(a) Claim Elements and Motion to Dismiss Standard**

Section 14(a) of the Exchange Act and SEC Rule 14a–9 "disallow the solicitation of a Proxy by a statement that contains either (1) a false or misleading declaration of material fact, or (2) an omission of material fact that makes any portion of the statement misleading." Desaigoudar v. Meyercord, 223 F.3d 1020, 1022 (9th Cir. 2000); see also 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9(a). "To state a claim under § 14(a) and Rule 14a–9, a plaintiff must establish that '(1) a Proxy statement contained a material misrepresentation or omission which (2) caused the plaintiff injury and (3) that the Proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction.'" N.Y.C.

1  Emps.' Ret. Sys. v. Jobs, 593 F.3d 1018, 1022 (9th Cir. 2010) (quoting Tracinda Corp. v.

2  DaimlerChrysler AG, 502 F.3d 212, 228 (3d Cir. 2007)), overruled on other grounds by Lacey v.

3  Maricopa County, 693 F.3d 896 (9th Cir. 2012) (en banc)." For a statement to be false or

4  misleading, it must 'directly contradict what the defendant knew at that time' or 'omit[ ] material

5  information.'" Weston Fam. P'ship LLLP v. Twitter, Inc., 29 F.4th 611, 619 (9th Cir. 2022)

6  (considering Section 10(b) claims and quoting Khoja v. Orexigen Therapeutics, Inc., 899 F.3d

7  988, 1008–09 (9th Cir. 2018)).

8      The Private Securities Litigation Reform Act (PSLRA) requires a plaintiff stating a claim

9  under Section 14(a) to: (1) "specify each statement alleged to have been misleading, the reason

10 or reasons why the statement is misleading, and, if an allegation regarding the statement or

11 omission is made on information and belief, ... all facts on which that belief is made," 15 U.S.C.

12 § 78u–4(b)(1)(B); (2) "state with particularity facts giving rise to a strong inference that the

13 defendant acted with the required state of mind," id. § 78u–4(b)(2)(A); and (3) establish that "the

14 act or omission of the defendant alleged to violate this chapter caused the loss for which the

15 plaintiff seeks to recover damages," id. § 78u–4(b)(4), that is, plead "loss causation," Stoneridge

16 Inv. Partners v. Sci.–Atlanta, 552 U.S. 148, 165 (2008).

17     If alleged material misrepresentations are premised on opinion statements, the plaintiff

18 must identify both the objective and subjective falsity of the misrepresentations. City of

19 Dearborn Heights Act 345 Police & Fire Ret. Sys. v. Align Tech., Inc., 856 F.3d 605, 615 (9th

20 Cir. 2017). But there are "three different standards for pleading falsity of opinion statements." Id.

21 "First, when a plaintiff relies on a theory of material misrepresentation, the plaintiff must allege

22 both that 'the speaker did not hold the belief she professed' and that the belief is objectively

23 untrue." Id. (quoting Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 575

24

U.S. 175, 185-86 (2015)). "Second, when a plaintiff relies on a theory that a statement of fact contained within an opinion statement is materially misleading, the plaintiff must allege that 'the supporting fact [the speaker] supplied [is] untrue.'" Id. (quoting Omnicare, 575 U.S. at 186). "Third, when a plaintiff relies on a theory of omission, the plaintiff must allege 'facts going to the basis for the [defendant's] opinion ... whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.'" Id. (quoting Omnicare, 575 U.S. at 194).

Lastly, in ruling on Defendants' motion under Fed. R. Civ. P. 12(b)(6), the Court must construe the complaint in the light most favorable to the non-moving party and accept all well-pleaded allegations of material fact as true. Livid Holdings Ltd. v. Salomon Smith Barney, Inc., 416 F.3d 940, 946 (9th Cir. 2005); Wyler Summit P'ship v. Turner Broad. Sys., 135 F.3d 658, 661 (9th Cir. 1998). Dismissal is appropriate only where a complaint fails to allege "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim is plausible on its face "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). As the Parties agree, Sohovich need only satisfy Rule 8, and not Rule 9, because he pursues only negligence-based claims. But because the PSLRA applies, Sohovich must plead with particularity the facts showing the falsity of the statements and the requisite state of mind. 15 U.S.C. § 78u–4(b). No scienter is required—only a negligent state of mind is required. See Knollenberg v. Harmonic, Inc., 152 F. App'x 674, 682 (9th Cir. 2005).

**B.      Sohovich States Claims under § 14(a)**

Sohovich has alleged sufficient facts to support his claims that there are two material and false statements in the Proxy and Proxy Supplement. Below, the Court reviews the two alleged false statements and their materiality.

**1.      Materiality of Statements Regarding May and July Projections**

Sohovich claims the Proxy falsely stated that the May and July Projections were "prepared on a reasonable basis, reflect[] the best currently available estimates and judgments, and present[], to the best of management's knowledge and belief, the expected course of action and the expected future financial performance of Avalara.'" (SAC ¶ 92.) To prove the falsity, Sohovich alleges that the May and July Projections undervalued the Company by excluding inorganic growth from future revenue projections, despite the executive drumbeat that M&A was in Avalara's DNA. And Sohovich argues the July Projections additionally reflect misleading and false statements that: (1) Avalara's Q2 2022 results were below management's expectations; and (2) the loss of revenues from Partner A justified a lower projection.

The Ninth Circuit held that Sohovich adequately alleges that the May and July Projections were objectively false and misleading because they did not include M&A revenues to forecast future revenues. As the Ninth Circuit explained, Sohovich provides substantial allegations that "Avalara had always included inorganic grown in its guidance, and when it did not, it 'explicitly stated as such,' like when CFO Tennenbaum did so on Analyst day." (Ninth Cir. Mem. at 7-8.) The Ninth Circuit also noted as relevant the data showing Avalara's acquisition-heavy business—it acquired twenty-eight companies from 2007 to 2021, including twelve between 2018 and 2021. (Id. at 8.) The Court concluded that "Sohovich's plethora of

particularized allegations plausibly suggest that the omission—or the lack of notice about such omission—could materially mislead a reasonable investor." (Id.)

Consistent with the Ninth Circuit's Memorandum, the Court finds Sohovich's allegations suffice to show the materiality of the statements concerning the May and July Projections. Given how central M&A had been to Avalara's strategy and historical growth, its omission from the May and July Projections is adequately alleged to have been material to representations made to investors about the fairness of the sale to Vista and the valuation of Avalara.

2.  **Proxy's Statements Regarding the ISS Recommendation**

The Court finds the Avalara's statements about the views of the Institutional Shareholder Services (ISS) were both objectively false and misleading, as well as material.

As the Ninth Circuit has held, Sohovich adequately alleges that the Schedule 14A Proxy Supplement filed by Avalara was objectively false and misleading because it cherry-picked ISS's positive views on the merger, while omitting its criticism. Indeed, as Defendants now concede, the "actual report [from ISS] differed meaningfully from Avalara's representation of it." (Def. Reply at 4.) That follows from the fact that Avalara's Proxy Supplement omitted ISS's statements that the merger was at a substantial discount to historic performance, that Altair's "scathing criticism of the merger" was "credible," that management endorsed a "whiplash turn from positive comments" to negative ones, and that ISS recommended voting against McFarlane's golden parachute. (SAC ¶¶ 116-118.) As the Ninth Circuit explained, "[t]hese particularized allegations, credited as true, 'create an impression of a state of affairs that differs in a material way from the one that actually exists,' i.e., that ISS's recommendation was not as approbatory as Avalara touted." (Ninth Cir. Mem. at 6 (quoting In re Facebook, Inc., 87 F.4th 934, 948 (9th Cir. 2023)).) The Ninth Circuit also explained that a separate SEC filing that

contained more of ISS's criticism did not "render Avalara's statements about the [ISS] report not false or misleading." (Id. at 7.) The Ninth Circuit quoted <u>Miller v. Thane Int'l, Inc.</u>, which explained: "Investors are not generally required to look beyond a given document to discover what is true and what is not" and that "[o]rdinarily, omissions by corporate insiders are not rendered immaterial by the fact that the omitted facts are otherwise available to the public." 519 F.3d 879, 881 (9th Cir. 2008) (cleaned up).

The Court finds the misrepresentations in Avalara's filing about the ISS report to be material. "[T]o fulfill the materiality requirement there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." <u>Basic Inc. v. Levinson</u>, 485 U.S. 224, 231–32 (1988) (citation and quotation omitted). Here, Sohovich has alleged that Defendants' selective quotation of the ISS report adversely altered the total mix of information available to investors. As the Ninth Circuit pointed out in the context of objective falsity, the selective quotation by Avalara of the ISS report "'create[d] an impression of a state of affairs that differ[ed] in a material way from the one that actually exists.'" (Ninth Cir. Mem. at 6 (quoting <u>In re Facebook</u>, 87 F.4th at 948).) As Sohovich alleges, ISS was a "leading independent proxy advisor firm," and a reasonable investor would have believed from reviewing Avalara's own SEC filings that ISS thought the deal was favorable when, in reality, it did not. (SAC ¶ 116.) Construing the allegations in Sohovich's favor, the Court finds that a reasonable investor would have found material the statements ascribed to ISS, particularly given that it is alleged to be a trusted, neutral proxy advisory firm. And while Altair filed other portions of the ISS report in a separate SEC filing, that alone does not convince the Court at the pleading stage that the affirmative filing by Avalara itself was not material. A reasonable investor may not have even

been aware of Altair's filing, particularly if the investor was focused solely on what Avalara itself filed with the SEC, not third-parties. As the Ninth Circuit has explained, "[i]nvestors are not generally required to look beyond a given document to discover what is true and what is not." Miller, 519 F.3d at 881. At the pleadings stage, Sohovich has adequately alleged that the omissions concerning ISS's full view of the deal was material.

C.     **Subjective Falsity and Negligence as to Individual Defendants**

The Ninth Circuit has remanded to this Court the question of whether Sohovich has pleaded subjective falsity and negligence as to each individual Board defendants other than McFarlane. The Court agrees in part with Sohovich that the allegations are adequate.

As to the misleading omission of inorganic growth in the May and July Projections, the Court finds the allegations of subjective falsity and negligence sufficient. As the SAC alleges, McFarlane presented information to the Board about the May and July Projections over nine separate meetings, from which the Board members are alleged to have known the projections omitted inorganic growth, and reflected risks and weaknesses that contradicted public statements. (SAC ¶¶ 123-24.) The Court finds these allegations plausible and sufficient to show that the Board was knowledgeable about Avalara's M&A history and how ingrained it was in the company's DNA such that they knew or should have known that the omission of inorganic growth was false and misleading. While the Court previously found these allegations insufficiently particularized as to each individual, the Court believes that they are sufficiently detailed given the Ninth Circuit's determination as to materiality and the centrality of inorganic growth. (See Order on Second MTD at 24.) Accordingly, the Court finds these allegations suffice to show subjective falsity and negligence as to each of the individual defendants.

As to the ISS misrepresentations, the Court finds the allegations of negligence and subjective falsity inadequate. At the outset, the Court notes that Defendants challenge only whether Sohovich has adequately pleaded each Board member's negligence as to the ISS-related disclosure, not subjective falsity. (See Defs. Supp. Mot. at 9.) But even under a negligence standard, Sohovich has not satisfied his pleading burden. Without citing any allegations in the SAC, Sohovich contends in his supplemental brief that the Schedule 14A Proxy Supplement itself shows how each director participated in its creation and thus knew or should have known about the misleading omissions about the full ISS report. (Pl. Resp. at 4.) But the Proxy Supplement only states that "Avalara and its directors, [and] executive officer . . . may be deemed to participants in the solicitation of proxies from the shareholders of Avalara in respect of the proposed transaction." (Dkt. No. 62 at 668.) That a director "may be deemed a participant" is not a sufficiently cogent allegation that the directors here knew anything about the full ISS report or the selective quotation of the ISS report in the Proxy Supplement. Nor are there allegations concerning any board meeting where the ISS report may have been discussed. Sohovich here asks the Court to infer negligence when the SAC itself fails to provide any supporting allegations. The Court finds the claims regarding the ISS report fail as against the individual Board defendants, apart from McFarlane. (See Order on Second MTD at 24-25 (finding the allegations of objective falsity and requisite mental state sufficient as to McFarlane).)

**D.    Loss Causation**

The Court finds that Sohovich has adequately pleaded loss causation.

1     Under Ninth Circuit precedent, the Court must assess whether Sohovich has "plausibly establish[ed] loss causation," which requires a connection between the proxy misstatements and an actual economic harm. In re Gilead Sci. Sec. Litig., 536 F.3d 1049, 1057 (9th Cir. 2008).

In support of loss causation, Sohovich alleges that "Avalara shareholders suffered damages in the amount of the difference between the price received in the Merger and the intrinsic value of their shares as calculated in accordance with recognized methods of valuation." (SAC ¶ 131.) Sohovich offers several specific allegations in support of this theory. First, Sohovich alleges that the $93.50/share price for the merger cannot be reconciled with Goldman's price target of $109/share, which it set after reviewing the Q2 2022 results approximately one month before the sale. (SAC ¶ 126.) Sohovich also alleges the projections improperly undervalued the company and misled investors into believing the deal properly valued the company. (Id. ¶¶ 127-31.) Second, Sohovich notes that shares traded at $95.55/share the day before the merger was announced, which suggests the intrinsic value was higher than the $93.50/share merger share price. (Id. ¶¶ 12, 87.) Defendants argue that the $95.55 price reflected the fact that news of the merger had leaked and artificially inflated the stock. But even if the Court accepts Defendants' speculative argument, it does not undermine Sohovich's theory. If the investing public believed Avalara would be sold, then a $95.55/share price reflected a reasonable investor's belief that the merger would be announced at a price of at least that amount—otherwise, the investors would lose money. Construing the allegations in Sohovich's favor, as the Court must, undermines Defendants' speculative theory that is not resolvable on a motion to dismiss. The Court finds Sohovich's loss causation allegations sufficient.

However, the Court declines Sohovich's request to take judicial notice of allegations from another lawsuit, as doing so is neither necessary nor adequately supported by the law Sohovich invokes.

**E.      Section § 20(a) Claims**

Because the Court finds the § 14(a) claims are sufficiently pleaded to proceed, the Court also allows the dependent § 20(a) claims to proceed.

## CONCLUSION

The Court finds that Sohovich has adequately alleged the materiality of the two statements that remain in this action. As to the May and July Projections' omission of inorganic growth, Sohovich has adequately alleged Section 14(a) claims against all of the named defendants. But he has failed to allege negligence as to the individual defendants concerning the Proxy Supplement's omission of the full views expressed by ISS. The claims concerning this alleged misrepresentation may proceed only against Avalara and McFarlane. That said, Sohovich has adequately alleged loss causation and he may pursue the dependent § 20(a) claims.

The Court's dismissal of the ISS-related claims against the other Board defendants is without prejudice. Within seven days of entry of this Order, Sohovich must file a notice of whether he intends to amend his complaint. If he chooses to amend, he must then file his amended complaint within fourteen days from the date he files his notice. If Sohovich files a notice indicating he does not wish to amend, then Defendants' must serve their Answer within thirty days of the filing on Sohovich's notice.

\\

\\

\\

The clerk is ordered to provide copies of this order to all counsel.

Dated September 12, 2025.

*[signature]*

Marsha J. Pechman
United States Senior District Judge